**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LIBERTY MUTUAL FIRE INSURANCE** | § | |
| **COMPANY,** | § | |
|     *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:25-cv-00011** |
| | § | |
| **ARCH INSURANCE COMPANY AND** | § | |
| **ALLIED WORLD ASSURANCE** | § | |
| **COMPANY (U.S.) INC.,** | § | |
|     *Defendants.* | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiff Liberty Mutual Fire Insurance Company ("Liberty") files this Original Complaint against Defendants Arch Insurance Company ("Arch") and Allied World Assurance Company (U.S.) Inc. ("Allied World") pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, and would respectfully show the Court as follows:

## I.
## PARTIES

1.1.    Liberty is an insurance company incorporated in the State of Wisconsin with its principal place of business in the Commonwealth of Massachusetts. Liberty was and is duly qualified to do and transact business in the State of Texas and executes and delivers insurance policies in the State of Texas.

1.2.    Arch is an insurance company organized under the laws of the State of Missouri with its principal place of business in the State of New Jersey. Arch may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. Liberty requests that citation be issued and served upon Arch.

1.3.    Allied World is an insurance company organized under the laws of the State of Arkansas with its principal place of business in Little Rock, Arkansas. Allied World may be served with process by serving the Texas Commissioner of Insurance, 333 Guadalupe, Austin, Texas 78701. Process may then be forwarded to: Allied World Surplus Lines Insurance Company, 1690 New Britain Avenue, Suite 101, Farmington, Connecticut 06032.

## II.
## JURISDICTION AND VENUE

2.1.    This action arises out of a set of disputes regarding insurance coverage in the form of the defense and indemnity of Andres Construction Services, LLC ("Andres") in a lawsuit styled as *Winstar Village, LLC v. Richard Brown Associates, P.C., et al.*, Cause No. CJ-17-5906 in the District Court of Oklahoma County, Oklahoma ("Underlying Suit"). Andres is a common insured of Liberty, Arch, and Allied World. Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Liberty asks the Court to declare the rights and duties of the parties under their respective insurance policies regarding coverage for the claim against Andres in the Underlying Suit. Under theories of breach of contract and contribution, Liberty also seeks to recover a portion of the monies it paid for the defense and settlement of the claims therein against Andres. That portion totals $398,860.35, and the action itself therefore is within the Court's diversity jurisdiction under 28 U.S.C. § 1332 because it is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.2.    Venue is appropriate in the Dallas Division of the Northern District of Texas pursuant to 28 U.S.C. § 1391(d). The parties have sufficient contacts to subject them to the Court's personal jurisdiction by issuing insurance policies to individuals or businesses in this district. Moreover, Andres is based in Dallas, Texas, and the relevant insurance policies were delivered to Andres there.

2.3.    All persons having an interest in the outcome of this litigation have been joined as parties. The interest of Liberty is adverse to the respective interests of Arch and Allied World, and an actual controversy of a justiciable nature exists between Liberty, on the one hand, and Arch and Allied World, on the other hand, regarding the parties' respective rights and responsibilities to their common insured with the Underlying Suit. No party to this action has sought to adjudicate such rights or responsibilities by any other legal action.

### III.
### BACKGROUND

**A.    The Underlying Suit.**

3.1.    On or about October 30, 2012, Andres contracted with Winstar Village, LLC ("Winstar"), to serve as general contractor for the construction of a multi-family residential housing project located in Love County, Oklahoma, called Central Park at Winstar Village ("Winstar Project"). Sometime thereafter, Winstar allegedly experienced "water entering the buildings through the building's roof and/or unsealed openings in the building's exterior causing damage to the dwelling units" and "standing water in the building corridors from rain water blowing into the open breezeways, which has caused water to cross over and under the door thresholds to the dwelling units to penetrate through the bottom of the walls adjacent to the building corridors and, otherwise, intrude into the dwelling units in the Project." *See* Exhibit "A," Plaintiff's First Amended Petition in the Underlying Suit, ¶ 22.[1] In addition to alleging damage from water intrusions, Winstar contended that "there [we]re other deficiencies and problems in the design and workmanship of the Project, such as those relating to the HVAC system, the stacked stone on the exterior of the Project, and certain other deficiencies." *Id.* at ¶ 26. Winstar also alleged that mold

---

[1]    Plaintiff's First Amended Petition was the live pleading at all times relevant to this dispute.

had begun to grow as a result of the water intrusions. *Id.* at ¶ 58, 62, 67. In its pleading, Winstar did not identify a specific date or date range for the alleged damage and did not indicate whether such damage had occurred during construction or after completion of the project.

3.2.     On June 20, 2016, Winstar filed suit against Richard R. Brown Associates, P.C. and Richard R. Brown (architects on the Winstar Project) in Case No. CJ-16-23 in Love County, Oklahoma. On October 13, 2017, Winstar filed suit against the same two defendants as well as Andres and Hartford Casualty Insurance Company in Cause No. CJ-17-5906 in Oklahoma County, Oklahoma. In April 2018, these two suits were consolidated into the Oklahoma County suit; i.e., the Underlying Suit. As against Andres, it alleged the following causes of action: (1) breach of contract; (2) breach of warranty; and (3) negligence. *See id.* ¶¶ 53-69.

3.3.     Around the time the suits were consolidated, Andres tendered its defense in the Underlying Suit to Liberty, Arch, and Allied World. Liberty and Arch insured Andres under commercial general liability policies, and Allied World insured Andres under a contractor's pollution liability policy. Originally, Liberty alone provided a defense to Andres. Allied World ultimately agreed to participate in the defense of Andres, also pursuant to a reservation of rights. Arch denied coverage outright to Andres. Over the course of July 21, 2021 and July 22, 2021, the Underlying Suit was mediated and settled, with only Liberty and Allied World contributing to the settlement on behalf of Andres. A representative of Arch attended the mediation, but Arch itself refused the demand of Liberty and Andres that it contribute to the settlement.

3.4.     Though Allied World accepted the defense of Andres and contributed to the settlement on behalf of Andres, Allied World refused to contribute to defense costs, which Liberty alone satisfied.

**B. The Insurance Policies.**

3.5.    Liberty issued to Andres the following commercial general liability insurance policies (the "Liberty Policies"):

    a.    Policy No. TB2-691-462998-024, with a policy period of September 1, 2014 to September 1, 2015;

    b.    Policy No. TB2-691-462998-025, with a policy period of September 1, 2015 to September 1, 2016; and

    c.    Policy No. TB2-462998-026, with a policy period of September 1, 2016 to September 1, 2017.

*See* Exhibit "B," Declaration Pages for the Liberty Policies.

3.6.    Arch issued to Andres the following commercial package policies, each including a commercial general liability coverage part (the "Arch Policies"):

    a.    Policy No. 41PKG8883000, with a policy period of September 1, 2012 to September 1, 2013; and

    b.    Policy No. 41PKG8909501, with a policy period of September 1, 2013 to September 1, 2014.

*See* Exhibit "C," Declaration Pages for the Arch Policies.

3.7.    The Arch Policies include the following provisions:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM** . . . .

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.  Insuring Agreement**

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .

        **(1)**  The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**. . . .

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** . . . .

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then we will share with all that other insurance by the method prescribed in Paragraph **c.** below. . . .

**c. Methods Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ration of its applicable limits of insurance of all insurers. . . .

3.8.    The Arch Policies also include Self-Insured Retention Endorsements, identifying a retention amount of $50,000.

3.9.    Allied World issued to Andres a Contractor's Pollution Liability Policy, no. 0305-8920, with a policy period of September 1, 2014 to September 1, 2015 (the "Allied World Policy"). *See* Exhibit "D," Declaration Page for the Allied World Policy.

3.10.    The Allied World Policy includes the following provisions:

**SECTION I – COVERAGES**

1. **Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury**, **property damage**, **environmental damage** or **emergency response expense** to which this insurance applies arising out of a **pollution incident** caused by **your work**, but only if:

(1) The **pollution incident** is caused by an **occurrence** that takes place in the **coverage territory**; and

(2) The **occurrence** takes place during the **policy period**.

b. We will have the right and duty to defend the insured against any **suit** seeking damages for **bodily injury**, **property damage**, **environmental damage** or **emergency response expense** to which this insurance applies. However, we will have no duty to defend the insured against any **suit** seeking damages to which this insurance does not apply. We may, at our discretion, investigate any **occurrence** and settle any **claim** or **suit** that may result. But:

(1) The amount we will pay for damages is limited as described in SECTION IV – LIMITS OF INSURANCE AND DEDUCTIBLE of this policy; and

(2) Our right and duty to defend end when we have used up the applicable limits of insurance in the payment of judgments, settlements, **clean-up costs** or **emergency response expense**. . . .

**SECTION V – CONDITIONS** . . . .

12. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this policy, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph b. below. However, in the event that a written contract or written agreement requires this insurance to be primary for any person or organization with whom you agreed to insure and such person or organization is an insured under this policy, we will not seek contributions from any such other insurance issued to such person or organization.

b. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will also follow this method. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of

its applicable limit of insurance to the total applicable limits of insurance of all insurers.

3.11.    Arch initially denied Andres's tender of defense for the stated reason that Andres had not satisfied the self-insured retention ("SIR") of the Arch Policies; however, even after learning that well over $50,000 had been expended in Andres's defense, thereby satisfying the SIR, Arch continued to deny its defense obligation.

3.12.    Initially, Liberty alone agreed to cover the defense and indemnity of Andres, with Allied World subsequently contributing towards the settlement of the Underlying Suit on Andres's behalf. Allied World refused to contribute to Andres's defense costs, however, despite its obligation to do so under the Allied World Policy.

3.13.    Per the terms of the Liberty Policies, Liberty is subrogated to the rights of Andres, including its cause of action for breach of contract, against Arch and Allied World for the monies Liberty paid to defend and settle the Underlying Suit. Because Liberty, Arch, and Allied World are co-primary insurers of Andres, Liberty also has independent causes of action for contribution against Arch and Allied World for their respective shares of the defense and settlement amounts.

**IV.**
**CAUSES OF ACTION**

**A.  Declaratory Judgment.**

4.1.    The Underlying Suit alleges that the Winstar Project sustained property damage as a result of the actions and/or omissions of Andres, and there is no exclusion in the Arch Policies that wholly precludes coverage. Therefore, pursuant to the Arch policies, Arch had a duty to defend and indemnify Andres in the Underlying Suit, subject to the Arch Policies' SIR.

4.2.    Despite being put on notice that the SIR had been met, Arch refused to participate in Andres's defense or contribute to the settlement of the claims against Andres.

4.3.    The Liberty Policies include an "Other Insurance" condition identical to that in the Arch Policies and the Allied World Policy. Accordingly, the Arch Policies, Allied World Policies, and Liberty Policies are co-primary, requiring each carrier to defend and indemnify their mutual insured "by equal shares." Despite the carriers' co-equal status, Arch has contributed nothing to the defense and indemnity of the parties' mutual insured Andres, and Allied World has contributed nothing to that defense.

4.4.    Pursuant to the Federal Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure, Liberty requests that the Court enter judgment declaring the following:

    a.  that Arch and Allied World had a duty to defend Andres on a co-primary basis with Liberty;

    b.  that Allied World is obligated to contribute one-third of the defense costs incurred in the Underlying Suit;

    c.  that Arch is obligated to contribute one-third of the defense costs incurred in the Underlying Suit once the SIR of the Arch Policies was met;

    d.  that Arch had a duty to contribute to the settlement of the claims in the Underlying Suit against Andres on a co-primary basis with Liberty; and

    e.  that Arch is obligated to contribute equally to the settlement costs Liberty incurred in the Underlying Suit on behalf of Andres.

**B.  Breach of Contract.**

4.5.    Liberty is both contractually and equitably subrogated to Andres's causes of action for breach of contract against Arch and Allied World. The Arch Policies and the Allied World Policy are valid and enforceable contracts, and all conditions precedent to Arch's and Allied World's participation in Andres's defense and the settlement of the Underlying Suit have been satisfied. Arch's refusal to contribute to the defense and settlement of the Underlying Suit constitutes a breach of contract that caused Liberty to incur damages in excess of $200,000 to protect the interests of Andres. Allied World's refusal to contribute to the defense costs of the

Underlying Suit constitutes a breach of contract that caused Liberty to incur damages of approximately $164,000 to protect the interests of Andres.

4.6.    Moreover, because of the actions and Arch and Allied World, Liberty has been required to retain the services of the undersigned law firm. Liberty has agreed to pay its attorneys a reasonable fee for their services necessarily rendered and to be rendered in this action. Pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code, Liberty is entitled to an award of reasonable attorneys' fees against Arch for having to bring this action, in an amount to be established at trial.

**C.  Contribution.**

4.7.    Alternatively, Liberty asserts a cause of action for contribution against Arch and Allied World for their share of the cost of Andres's defense in the Underlying Suit and against Arch for the amounts paid by Liberty to settle the Underlying Suit against Andres.

**V.**
**CONDITIONS PRECEDENT**

All conditions precedent to bringing this action have been performed, have occurred, or have been waived.

**VI.**
**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Liberty prays that Arch and Allied World be cited to appear and answer herein and that, on final hearing, Liberty have judgment as follows:

a.  A judgment declaring that Arch had a duty to defend and indemnify Andres on a co-primary basis with Liberty;

b.  A judgment declaring that Allied World had a duty to defend Andres on a co-primary basis with Liberty;

c.  A judgment declaring that Arch is obligated to contribute one third of the defense costs incurred in the Underlying Suit after satisfaction of the SIR in the Arch Policies;

d.  A judgment declaring that Allied World is obligated to contribute one third of the defense costs incurred in the Underlying Suit;

e.  A judgment declaring that Arch is obligated to contribute to half of the settlement amount paid by Liberty in the Underlying Suit to protect the parties' mutual insured;

f.  A judgment awarding actual damages for Arch's share of the defense and settlement costs incurred by Liberty on behalf of Andres;

g.  A judgment awarding of actual damages for Allied World's share of the defense and settlement costs incurred by Liberty on behalf of Andres;

h.  Pre-judgment and post-judgment interest;

i.  Attorneys' fees and costs of suit; and

j.  All other relief, in law or in equity, to which Liberty may be entitled.


Respectfully submitted,

**HANNA & PLAUT, L.L.P.**
211 East Seventh Street, Suite 600
Austin, Texas 78701
Telephone:(512) 472-7700
Facsimile: (512) 472-0205

By: _ /s/ Catherine L. Hanna_
          Catherine L. Hanna
          State Bar No. 08918280
          channa@hannaplaut.com
          Alexander P. Sheppard
          Texas Bar No. 24106427
          asheppard@hannaplaut.com

**ATTORNEYS FOR PLAINTIFF LIBERTY MUTUAL FIRE INSURANCE COMPANY**

# EXHIBIT A



**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

WINSTAR VILLAGE, LLC,         )
                                      )
      Plaintiff,              )
                                      )
v.                                    )     Case No.: CJ-2017-5906
                                    )
RICHARD R. BROWN ASSOCIATES, P.C.,  )
RICHARD R. BROWN,         )
ANDRES CONSTRUCTION SERVICES,  )
LLC, and              )
HARTFORD CASUALTY INSURANCE  )
COMPANY,              )
                                    )
      Defendants,            )
                                    )
-------------------------------------------------------- )
                                    )
RICHARD R. BROWN ASSOCIATES, P.C.,  )
and RICHARD R. BROWN,      )
                                    )
      Third-Party Plaintiffs,    )
                                    )
v.                                    )
                                    )
ANDRES CONSTRUCTION SERVICES, LLC, )
EST, INC.,VIEWTECH, INC.,    )
and JORDAN & SKALA ENGINEERS, INC.,  )
                                    )
      Third-Party Defendants.   )

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY – 7 2018

RICK WARREN
COURT CLERK
42_____

### PLAINTIFF'S AMENDED PETITION

COMES NOW Plaintiff, Winstar Village, LLC, and for its causes of action against

Defendants Richard R. Brown Associates, P.C., Richard R. Brown, Andres Construction Services,

LLC, and Hartford Casualty Insurance Company, alleges and states as follows:

### PARTIES

1.     Plaintiff, Winstar Village, LLC, is an Oklahoma limited liability company.

2.    Defendant Richard R. Brown Associates, P.C. ("RBA"), is an Oklahoma professional corporation also known as and doing business as RBA Architects.

3.    Defendant Richard R. Brown ("Brown"), is a citizen of the State of Oklahoma and a licensed architect in the State of Oklahoma.

4.    Defendant/Third-Party Defendant, Andres Construction Services, LLC ("Andres"), is a Texas limited liability company.

5.    Defendant, Hartford Casualty Insurance Company ("Hartford"), upon information and belief, is an Indiana insurance company licensed to transact business in the State of Oklahoma.

## JURISDICTION AND VENUE

6.    Jurisdiction in this Court is proper pursuant to 12 O.S. § 2004 (F).

7.    This is an action resulting from breach of contract, breach of warranty, negligence, and bad faith. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs. The Plaintiff is an Oklahoma company, Defendant RBA is an Oklahoma professional corporation, and Defendant Brown is a citizen of the State of Oklahoma.

8.    Venue is proper pursuant to 12 O.S. § 131 because RBA is a domestic corporation

## FACTS

9.    On August 24, 2012, Plaintiff, as Owner, and RBA, as Architect, entered into an Agreement for Architectural Services (the "Architect's Agreement") for RBA to provide architectural services in connection with the construction of Central Park at Winstar Village, a multi-family residential housing project (the "Project"). The Architect's Agreement was subsequently amended on October 26, 2012 pursuant to a First Amendment to Agreement for Architectural Services. A copy of the Architect's Agreement, as amended, is attached hereto. [*See Ex. 1, the Architect's Agreement*].

2

10.    The Project is a multi-family residential housing project located in Love County, Oklahoma. It contains two hundred fifty-two (252) multi-story dwelling units in thirteen (13) detached buildings, a clubhouse building, a common area, a pool, recreational and parking amenities, and related facilities.

11.    The Architect's Agreement provided that RBA would furnish architectural services for the design, construction, and inspection of the Project, including, but not limited to, site planning, design development, preparation of drawings and specifications for the entire Project, general administration of the construction contract related to the Project, weekly architectural inspections at the Project, and to generally guard Plaintiff against defects and deficiencies in the construction of the Project.

12.    In the Architect's Agreement, RBA "agree[d] that the Architect [RBA] will be liable to the Owner [Plaintiff] for any defects and deficiencies in the Construction Documents and to the consequences arising therefrom and that the Construction Documents will be satisfactory for the purposes intended." [*See ¶ 1.10 of the Architect's Agreement, attached hereto as Ex. 1*].

13.    RBA further agreed to indemnify and "to defend and hold the Owner [Plaintiff] ... harmless from and against any and all claims, demands, losses, costs, damages, and expenses of every nature whatsoever resulting from or relating to the Architect's performance of its duties under the Contract Documents and to any defect or deficiency in the design features of the Construction Documents and to all other similar related claims, demands, losses, costs, damages and expenses, all of which shall include judgments, penalties, interest, court costs and legal fees incurred with respect thereto, as well as consequential damages and lost profit resulting therefrom or relating thereto." [*See ¶ 8.3 of the Architect's Agreement, attached hereto as Ex. 1*].

3

14.    Richard R. Brown, as a licensed architect and employee of RBA, performed professional architectural services for the Project.

15.    RBA prepared drawings and specifications (the "Drawings and Specifications") for the Project. The Drawings and Specifications designed each of the thirteen (13) buildings at the Project containing dwelling units to have open corridors and open breezeways that are exposed to the weather and other outside elements.

16.    On October 30, 2012, Plaintiff and Andres entered into an agreement for construction services (the "Construction Contract"), wherein Andres would provide construction services in connection with the Project. A copy of the Construction Contract is attached hereto. [*See Ex. 2, the Construction Contract*].

17.    The Construction Contract provides that all construction would be constructed pursuant to an in strict accordance with the Plans and Specification prepared by RBA. [*See ¶ 1.1 of the Construction Contract, attached hereto as Ex. 2*].

18.    The Construction Contract provides that Andres would advise Plaintiff of all defects in the Plans and Specifications that Andres discovers. [*See ¶ 1.4 of the Construction Contract, attached hereto as Ex. 2*].

19.    The Construction Contract provides that Andres warrants and guarantees all work and materials furnished under the Contract Documents against defects in materials and workmanship. [*See ¶ 1.3 and 1.5 of the Construction Contract, attached hereto as Ex. 2*].

20.    The Construction Contract provides that Andres would (i) re-execute any parts of the Work that fail to conform with the requirements of the Contract that appear in the progress of the Work; (ii) remedy any defects in the Work due to faulty materials or workmanship which appear within a period of one year after the Date of Substantial Completion of the Work of any

4

Phase…; and (iii) replace, repair, or restore any part of the Improvements or furniture, fixtures, equipment, or other items of personal property placed therein … that are injured or damaged by any such parts of the Work that do not conform to the requirements of the Contract Documents or by defects in the Work. [*See ¶ 1.6 of the Construction Contract, attached hereto as Ex. 2*].

21.     On October 22, 2012, prior to execution of the Construction Contract, Andres and Hartford entered into a Performance Bond, wherein Andres and Hartford jointly and severally bound themselves to Plaintiff for the performance of the Construction Contract. Pursuant to the Performance Bond, Harford is liable for: (i) the responsibilities of Andres for the correction of defective work; (ii) additional legal, design professional, and delay costs resulting from Andres default, and resulting from Hartford's actions or failure to act …; and (iii) liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of Andres. [*See ¶ 6 of the Performance Bond, attached hereto as Ex. 3*].

22.     Plaintiff has experienced and continues to experience water entering the buildings through the building's roof and/or unsealed openings in the building's exterior causing damage to the dwelling units.  Additionally, Plaintiff has experienced and continues to experience problems with standing water in the building corridors from rain water blowing into the open breezeways, which has caused water to cross over and under the door thresholds to the dwelling units to penetrate through the bottom of the walls adjacent to the building corridors and, otherwise, intrude into the dwelling units in the Project.

23.     The water intrusion caused significant damage to the Project.

24.     As a result of the water intrusion, Plaintiff has been required to perform extensive remediation and rebuilding work to repair all of the dwelling units that were damaged. In addition,

Plaintiff has been forced to use personnel to sweep water out of the corridors during rain events at the Project.

25.     RBA, Brown, and Andres have been notified of the problems and the water intrusion, but have failed to remediate the damage or resolve the defect.

26.     In addition to the water intrusion problem, there are other deficiencies and problems in the design and workmanship of the Project, such as those relating to the HVAC system, the stacked stone on the exterior of the Project, and certain other deficiencies. RBA, Brown, and Andres are aware of these deficiencies.

## CLAIMS AGAINST RBA

### I. Breach of Contract

27.     Plaintiff fully incorporates each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein.

28.     Pursuant to the terms of the Architect's Agreement, RBA was contractually obligated to design the project, prepare drawings and specifications for the construction of the Project, and supervise, inspect and test the work on behalf of Plaintiff.

29.     RBA breached its obligations under the Architect's Agreement by failing to design the buildings such that rain blown into the breezeways of the corridors would not be able to accumulate deep enough to penetrate into the dwelling units.

30.     RBA breached its obligations under the Architect's Agreement by failing to properly prepare drawings and specifications which would prevent water from accumulating in the corridors which could lead to damage to the dwelling units.

31.     RBA breached its obligations under the Architect's Agreement by failing to design, instruct, inspect, or test the slope of the corridors under circumstances when it knew or should

6

have known that water might pool or remain standing in the corridors which could lead to damage to the dwelling units.

32.    RBA also breached its contractual obligations under the Architect's Agreement to supervise and inspect Andres Construction Service, LLC, the contractor's work on the Project.

33.    RBA breached is contractual obligations under the Architect's Agreement to indemnify and hold Plaintiff harmless from losses, cost, damages and expenses incurred by Plaintiff resulting from or relating to RBA's performance with duties under the Contract and with respect to any defect or deficiency in the design feature of the construction documents and all other similar or related claims, demands, losses, cost, damages and expenses.

34.    To the extent any of the problems, damages or defects are the result of work by subcontractors retained by RBA, RBA breached its obligation to properly supervise any such subcontractor and breached its obligation to indemnify Plaintiff from any losses or damages resulting from such subcontractor.

35.    Plaintiff has sustained property damage caused by RBA and/or its employees and the work performed by RBA and/or its employees. Plaintiff's damages include, but are not limited to, mold that began to grow as a direct result of the aforementioned water intrusions.

36.    As a result of RBA's breach of its contractual obligations, both expressed and implied, Plaintiff has incurred substantial expenses, damages, and losses for which Plaintiff claims total damages in an amount exceeding seventy-five thousand dollars ($75,000.00).

## II. Breach of Warranty

37.    Plaintiff fully incorporates each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein.

38.    RBA breached its expressed warranties as set out in the Architect's Agreement.

7

39.    RBA breached its implied warranties of merchantability and fitness for a particular purpose.

40.    Plaintiff has sustained property damage caused by RBA and/or its employees and the work performed by RBA and/or its employees. Plaintiff's damages include, but are not limited to, mold that began to grow as a direct result of the aforementioned water intrusions.

41.    As a result of RBA's breach of its implied warranties, Plaintiff has incurred substantial expenses, damages and losses for which Plaintiff claims total damages in an amount exceeding seventy-five thousand dollars ($75,000.00).

### III. Negligence

42.    Plaintiff fully incorporates each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein.

43.    RBA owed a duty to Plaintiff to perform its obligations as an architect to the standards required by the architectural profession.

44.    RBA breached its duties by failing to properly design, prepare adequate drawings and specifications, supervise, test and inspect the construction of the Project.

45.    Plaintiff has sustained property damage caused by the negligent acts of RBA and/or its employees, and the negligent work performed by RBA and/or its employees. Plaintiff's damages include, but are not limited to, mold that began to grow as a direct result of the aforementioned water intrusions.

46.    As a result of RBA's negligence, Plaintiff has incurred substantial expenses, damages and losses for which Plaintiff claims total damages in an amount exceeding seventy-five thousand dollars ($75,000.00).

8

## CLAIMS AGAINST BROWN

### I. Negligence

47.    Plaintiff fully incorporates each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein.

48.    Richard R. Brown is an employee of RBA, who performed professional architectural services for the Project on behalf of Plaintiff.

49.    Richard R. Brown, as professional architect, owed the duty to Plaintiff to perform his obligations as an architect to the standards required by the architectural profession.

50.    Richard R. Brown, breached his duties by failing to properly design, prepare adequate drawings and specifications, supervise, test and inspect the construction of the Project.

51.    Plaintiff has sustained property damage caused by the negligent acts of Brown and/or the negligent work performed by Brown. Plaintiff's damages include, but are not limited to, mold that began to grow as a direct result of the aforementioned water intrusions.

52.    As a result of Richard R. Brown's negligence, Plaintiff has incurred substantial expenses, damages and losses for which Plaintiff claims total damages in an amount exceeding seventy-five thousand dollars ($75,000.00).

## CLAIMS AGAINST ANDRES AND HARTFORD

### I. Breach of Contract

53.    Plaintiff fully incorporates each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein.

54.    Pursuant to the Performance Bond, Hartford and Andres are jointly and severally liable for Plaintiff's claims against Andres. [*See ¶ 6 of the Performance Bond, attached hereto as Ex. 3*].

9

55.    Andres breached its contractual obligations under the Construction Contract by failing to construct the Project in strict accordance with the Plans and Specification prepared by RBA.

56.    Andres breached its contractual obligation by failing to advise Plaintiff of defects it discovered in RBA's Plans and Specifications.

57.    Andres further breached its contractual obligation by failing to re-execute its Work that failed to conform with the requirements of the Contract; by failing to remedy defects in its Work caused by faulty workmanship; and by failing to replace, repair, and/or restore Improvements, furniture, fixtures, equipment, and/or other items of personal property placed therein ... that were damaged by parts of the Work that do not conform to the requirements of the Contract Documents or by defects in the Work.

58.    Plaintiff has sustained property damage caused by Andres and/or its subcontractors, including but not limited to those responsible for the roof, exterior, and concrete installations. Plaintiff's damages include, but are not limited to, mold that began to grow as a direct result of the aforementioned water intrusions.

59.    As a result of Andre's breach of its contractual obligations, both express and implied, Plaintiff has incurred substantial expenses, damages, and losses for which Plaintiff claims total damages in an amount exceeding seventy-five thousand dollars ($75,000.00).

## II. Breach of Warranty

60.    Plaintiff fully incorporates each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein.

61.    Andres breached its express warranty and/or guaranty, as set out in the Construction Contract, by providing Work consisting of defects and faulty workmanship.

10

62.     Plaintiff has sustained property damage caused by Andres and/or its subcontractors, including but not limited to those responsible for the roof, exterior, and concrete installations. Plaintiff's damages include, but are not limited to, mold that began to grow as a direct result of the aforementioned water intrusions.

63.     As a result of Andre's breach of its express warranty, Plaintiff has incurred substantial expenses, damages, and losses for which Plaintiff claims total damages in an amount exceeding seventy-five thousand dollars ($75,000.00).

### III. Negligence

64.     Plaintiff fully incorporates each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein.

65.     Andres knew of several defects in RBA's Plans and Specifications; nonetheless, Andres negligently failed to correct said defects, negligently failed to notify Plaintiff, and negligently incorporated said defects into the Project.

66.     Andres also negligently failed to construct the Project consistent with that of a reasonable contractor. Said negligent failures include defects in the construction and faulty workmanship.

67.     Plaintiff has sustained property damage caused by the negligent acts and work of Andres and/or its subcontractors, including but not limited to those responsible for the roof, exterior, and concrete installations. Plaintiff's damages include, but are not limited to, mold that began to grow as a direct result of the aforementioned water intrusions.

68.     Plaintiffs financial losses were a foreseeable result of Andre's negligent acts. Furthermore, Andre's negligent acts and omissions are a direct and proximate cause of the extensive property damage and monetary loss Plaintiff has suffered

11

69.    As a result of Andre's negligence, Plaintiff has suffered substantial expenses, damages, and losses for which Plaintiff claims total damages in an amount exceeding seventy-five thousand dollars ($75,000.00).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Winstar Village, LLC, prays for judgment on the claims set forth above against Defendant Richard R. Brown Associates, P.C., Defendant Richard R. Brown, Defendant/Third-Party Defendant Andres Construction Services, LLC, and Defendant Hartford Casualty Insurance Company, and for an award of actual and consequential damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00). Plaintiff also prays for costs, interest, and other such relief this Court deems equitable and proper.

Respectfully submitted,

Michael Burrage, OBA #1350
Reggie N. Whitten, OBA #9576
Matthew Mowdy, OBA #32838
WHITTEN BURRAGE
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102
Telephone:    (405) 516-7800
Facsimile:    (405) 516-7859
Email:    mburrage@whittenburragelaw.com
          rwhitten@whittenburragelaw.com
          mmowdy@whittenburragelaw.com

*and*

Henry D. Hoss, OBA #11354
Lloyd T. Hardin, Jr., OBA #03842
Scott Delaney, OBA #31535
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
Telephone:    (405) 235-9621
Facsimile:    (405) 235-0439

12

Email:    henry.hoss@mcafeetaft.com

*and*

Glenn W. Mattar, (MT Bar # 13228)
Larry W. Jenkins, Jr (MI Bar # P65375)
DENENBERB TUFFLEY, PLLC
28411 Northwestern Hwy. S. 600
Southfield, MI 48034
Telephone:    (248) 549-3900
Facsimile:    (248) 593-5808
Email:    gmattar@dt-law.com
          ljenkins@dt-law.com

**ATTORNEYS FOR PLAINTIFF
WINSTAR VILLAGE, LLC**

**ATTORNEY'S LIEN CLAIMED
JURY TRIAL DEMANDED**

13

## CERTIFICATE OF MAILING

This is to certify that on May 7, 2018, a true and correct copy of the above and foregoing was sent to the following:

Stephen L. Olson
Benjamin Saunier
PIERCE COUCH HENDRICKSON BAYSINGER &
   GREEN, LLP
1109 N. Francis
P.O. Box 26350
Oklahoma City, OK 73126

*Attorneys for Defendants*
*Richard R. Brown Associates, P.C.,*
*and Richard R. Brown*

Michael Woodson
EDMONDS COLE LAW FIRM, P.C.
7 S. Mickey Mantle Drive, Suite 375
Oklahoma City, OK 73104

-and-

Charlotte Fletcher,
SLATES HARWELL LLP
1700 Pacific Avenue, Suite 3800
Dallas, TX 75201

*Attorneys for Third Party Defendant Andres*
*Construction Services LLC and Defendant*
*Hartford Casualty Insurance Company*

Jennifer A. Bruner
JENNIFER A. BRUNER, P.C.
501 NW 13th Street
Oklahoma City, OK 73103

*Attorney for Third Party Defendant*
*EST, Inc.*

W. Michael Hill
Diane M. Black
SECREST, HILL, BUTLER & SECREST
7134 South Yale, Suite 900
Tulsa, OK 74136

*Attorneys for Third Party Defendant Jordan*
*& Skala Engineers, Inc.*

Robert H. Holmes
19 St. Laurent Pl.
Dallas, TX 75225

-and-

Clint B. Sloan
123 N. Crockett Street, Suite 200
Sherman, TX 75090

*Attorneys for Third Party Defendant*
*ViewTech, Inc.*

_____
Matthew Mowdy

14

FIRST AMENDMENT
TO
AGREEMENT FOR ARCHITECTURAL SERVICES

THIS FIRST AMENDMENT is made and entered into this 26 ⁷ᵗᴴ day of October, 2012 to be effective as of the 24th day of August, 2012, between **WINSTAR VILLAGE, LLC,** an Oklahoma limited liability company, having an office at 2020 Lonnie Abbott Boulevard, Ada, Oklahoma 74820-9255 (the "**Owner**"), and **RICHARD R. BROWN ASSOCIATES, P.C.,** an Oklahoma professional corporation, also known and doing business as **RBA ARCHITECTS,** an Oklahoma professional corporation, having an office at 14918 Hertz Quail Springs Parkway, Oklahoma City, Oklahoma 73134 (collectively, the "**Architect**").

RECITALS:

A.    The Owner and the Architect entered into that certain Agreement for Architectural Services, dated effective August 24, 2012 (the "**Architectural Agreement**"). Unless otherwise defined herein, the capitalized terms used herein will have the meanings set forth in the Architectural Agreement.

B.    The Owner and the Architect desire to amend the Architectural Agreement so as to correct the proper legal name of the Architect to be **RICHARD R. BROWN ASSOCIATES, P.C.,** an Oklahoma professional corporation, also known and doing business as **RBA ARCHITECTS,** an Oklahoma professional corporation.

NOW THEREFORE, in consideration of the above premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

1.    Architect Identity.    That the name of the Architect as defined in the initial paragraph to the Architectural Agreement, and whenever and wherever thereafter as used in the Architectural Agreement or in any of the other Contract Documents, is hereby amended, corrected and modified, effective as of the original Effective Date of the Architectural Agreement, to be **RICHARD R. BROWN ASSOCIATES, P.C.,** an Oklahoma professional corporation, also known and doing business as **RBA ARCHITECTS,** an Oklahoma professional corporation, having an office at 14918 Hertz Quail Springs Parkway, Oklahoma City, Oklahoma 73134 (collectively, the "**Architect**").

2.    Binding Effect.    Except as specifically amended by this First Amendment, the Architectural Agreement is hereby ratified and shall continue in full force and effect, without further amendment, abatement or interruption, according to the terms and conditions set forth therein.

[SIGNATURE PAGE FOLLOWS]



This First Amendment is entered into as of the day and year first written above, to be effective as of the 24th day of August, 2012.

ARCHITECT:

RICHARD R. BROWN ASSOCIATES, P.C., an Oklahoma professional corporation, also known and doing business as RBA ARCHITECTS, an Oklahoma professional corporation

By: Richard R. Brown,
    President

OWNER:

WINSTAR VILLAGE, LLC
an Oklahoma limited liability company

By: Pat Neeley,
    Manager

2

EXECUTION VERSION

AGREEMENT FOR ARCHITECTURAL SERVICES

BETWEEN

WINSTAR VILLAGE, LLC,
an Oklahoma limited liability company

AND

RBA ARCHITECTS
an Oklahoma professional corporation

DATED: _Aug 24_ , 2012

# TABLE OF CONTENTS

ARTICLE I .......................................................................................................... 2
    Architect's Basic Services ............................................................................ 2
        1.1    Site Planning Phase ...................................................... 2
        1.2    Schematic Design Phase ............................................... 3
        1.3    Design Development and Construction Documents Phases ...... 5
        1.4    Bidding or Negotiation Phase ....................................... 7
        1.5    Construction Phase – Administration of the Project Contract .... 8
        1.6    General Duties of the Architect ...................................... 9
        1.7    Project Representation Beyond Basic Services .................. 11
        1.8    Insurance and Indemnity ............................................ 11
        1.9    Architect's Representatives .......................................... 13
        1.10   Quality of Work ....................................................... 13
        1.11   Schedule of Completion of Phases ................................. 13
ARTICLE II ......................................................................................................... 14
    Architect's Compensation ........................................................................... 14
        2.1    Basic Fee .............................................................. 14
        2.2    Excessive Construction Cost ........................................ 14
        2.3    Payments to the Architect ........................................... 14
        2.4    Payment Certificates ................................................. 14
        2.5    Lien Releases and Waivers .......................................... 15
        2.6    Extended Administration ............................................. 15
ARTICLE III ........................................................................................................ 15
    Reimbursable Expenses .............................................................................. 15
        3.1    Enumeration of Expenses ........................................... 15
        3.2    Excluded Expenses ................................................... 16
        3.3    Reimbursable Expense Statements ................................. 16
ARTICLE IV ........................................................................................................ 16
    Additional Services ................................................................................... 16
        4.1    Enumeration of Additional Services ................................ 16
        4.2    Payment for Additional Services .................................... 18
        4.3    Direct Personnel Expense ........................................... 18
        4.4    Special Consultants' Fees ........................................... 18
ARTICLE V ......................................................................................................... 19
    Owner's Responsibilities ............................................................................ 19
        5.1    Project Program ....................................................... 19
        5.2    Designation of Representatives; Approval of Documents ....... 19
        5.3    Surveys and Subsurface Investigations ........................... 19
        5.4    Bidding Information ................................................... 19
ARTICLE VI ........................................................................................................ 19
    Termination ............................................................................................ 19
        6.1    Termination without Cause .......................................... 19
        6.2    Termination with Cause .............................................. 20
        6.3    Use of Drawings ...................................................... 21

|  | 6.4 | Architect's Liability | 21 |
|  | 6.5 | Replacement Architect | 21 |
|  | 6.6 | Cumulative Effect | 22 |
| ARTICLE VII | | | 22 |
|  | Ownership of Plans; Architect's Records | | 22 |
|  | 7.1 | Ownership of Documents | 22 |
|  | 7.2 | Architect's Accounting Records | 22 |
| ARTICLE VIII | | | 22 |
|  | Resolution of Disputes | | 22 |
|  | 8.1 | Mediation | 22 |
|  | 8.2 | Venue; Governing Law | 23 |
|  | 8.3 | Full Liability; Indemnification | 23 |
|  | 8.4 | Certain Definitions | 23 |
| ARTICLE XI | | | 24 |
|  | General Provisions | | 24 |
|  | 9.1 | Successors and Assigns | 24 |
|  | 9.2 | Extent of Agreement | 24 |
|  | 9.3 | Advertising and Promotion | 24 |
|  | 9.4 | Execution of Documents by the Architect | 24 |
|  | 9.5 | Indemnification by Contractor | 25 |
|  | 9.6 | Force Majeure | 25 |
|  | 9.7 | Notices | 26 |
|  | 9.8 | Certain Definitions | 28 |
|  | 9.9 | Confidentiality | 28 |
|  | 9.10 | Terms Generally | 28 |
|  | 9.11 | Severability | 29 |
|  | 9.12 | Attorneys' Fees | 29 |
|  | 9.13 | Counterparts | 29 |

## AGREEMENT FOR ARCHITECTURAL SERVICES

THIS AGREEMENT FOR ARCHITECTURAL SERVICES (the "**Agreement**") is made effective this 24 ᵗʰ day of August , 2012 (the "**Effective Date**"), between **WINSTAR VILLAGE, LLC**, an Oklahoma limited liability company, having an office at 2020 Lonnie Abbott Boulevard, Ada, Oklahoma 74820-9255 (the "**Owner**"), and **RBA ARCHITECTS**, an Oklahoma professional corporation, having an office at 14918 Hertz Quail Springs Parkway, Oklahoma City, Oklahoma 73134 (the "**Architect**").

### R E C I T A L S :

A.     The Owner intends to construct a multi-family residential housing project containing approximately: (i) two hundred fifty-two (252) multi-story dwelling units (a "**Unit**") consisting of: (a) one, two and three bedroom unit types located within thirteen (13) detached wood frame structure types; and (b) which may include one building and the Units therein which will be designed, equipped, operated and managed as transient or short term occupancy facilities (the "**Hotel Suite Facilities**"), including the design and installation of all furniture, fixtures, appliances, equipment, apparatuses and Hotel FFE Specifications (hereafter defined) therefor and the inspection and supervision of the Contractor during the installation, construction and equipping of the Hotel FFE (hereafter defined); plus (ii) certain clubhouse, business service center, food and beverage and related facilities (sometimes herein collectively called, the "**Clubhouse Facilities**"); plus (iii) certain common area, pool, recreational and parking amenities and related facilities for all of the preceding (sometimes herein collectively called the "**Common Area Facilities**"); plus (iv) certain managerial, sales, leasing and marketing facilities (the "**Marketing Facilities**"); all of which are sometimes also commonly known as the "**Central Park at WinStar Village**" (collectively, the "**Project**").

B.     The Project will be located on real estate located in Love County, Oklahoma and the legal description of the real estate upon which the Project is to be constructed is more particularly described on *Exhibit A* attached hereto (the "**Site**").

C.     The Owner desires to obtain, and the Architect desires to furnish, the services of the Architect in connection with the Project, in accordance with the terms and provisions of this Agreement. By way of illustration, but not limitation, it is the intent of the Owner that the Architect, the general contractor and/or the Purchasing Agent (hereafter described) selected by the Owner to construct the Project and install the FFE (hereafter defined) therein (sometimes herein collectively called the "**Contractor**") and the separate engineering service company which will be providing civil engineering services to the Owner (the "**Site Civil Engineer**") for the initial development of the Site to permit construction of the Project (other than normal engineering services for the hereafter defined PEMS Systems, Life Safety Systems, ADA Systems and environmental engineering services which are to be included in the Basic Fee) will

1

perform and interact among themselves and with the Owner on a continuing basis so as to determine and resolve design and construction criteria and make other pertinent decisions.

NOW, THEREFORE, the Owner and the Architect for the consideration hereinafter set forth agree as follows:

## ARTICLE I

### Architect's Basic Services

The Architect's Basic Services consist of the five (5) phases described in **Sections 1.1** through **1.5** and the general services and duties expressed in **Section 1.6** below. It is understood that all such services include all necessary or appropriate engineering services for: (a) all mechanical, electrical, plumbing, structural, lighting, acoustical, ventilation and air treatment or handling systems (collectively, the "**MEPS Systems**"); (b) all life safety, security and fire protection systems (collectively, the "**Life Safety Systems**"); and (c) all systems, facilities and designs required for compliance with the Americans with Disabilities Act (the "**ADA Systems**"; the MEPS Systems, the Life Safety Systems and the ADA Systems are sometimes herein collectively called, the "**Project Systems**"). In addition to the preceding, the Basic Services are described as follows:

1.1    Site Planning Phase.  The Site Planning Phase for the Project will commence upon the signing of this Agreement and will terminate upon the completion of the services required by this **Section 1.1**. Taking into account any preliminary construction budget estimate as directed by the Owner and delivered to the Architect (the "**Construction Budget**"); circulation requirements; parking and trucking requirements; public and private utilities; sub-soil conditions and other special engineering factors influencing the Site and the Project; those Laws and all applicable ordinances, rules, zoning regulations and building code requirements, including without limitation the applicable International Building Code requirements; all other Laws of the State of Oklahoma (the "**State**") and all other laws of federal, State or local Governmental Authorities as are applicable to the Project or as are designated as applicable by the Owner; all climatic and topographical characteristics of the Site; and such other design factors, criteria or requirements designated by the Owner as applicable to Central Park at WinStar Village complex; and such other considerations as might otherwise be so designated by the Owner.

The Site Planning Phase will consist of plans, renderings, research, data, calculations, drawings and other documents (the "**Site Planning Studies**") which will address and include all of the preceding. In preparation of the Site Planning Studies, the Architect will:

1.1.1  Visit and become familiar with the Site and its surrounding areas, and determine, after due investigation, to the best of the Architect's professional knowledge and belief, the application of all federal, State and local codes, ordinances, rules, regulations and Laws affecting the Project.

2

1.1.2   Investigate the availability of all necessary utility services and meet with and discuss such services with all appropriate authorities, including without limitation the "Chickasaw Tribal Utility Authority" (the "**CTUA**").

1.1.3   Formulate a development concept indicating land use and general massing for the Project.

1.1.4   Prepare design studies and documentation of the development concept as necessary to provide a sound basis for a subsequent detailed architectural and engineering design for the Project.

1.1.5   Prepare plans for the Site and other diagrammatic drawings which will adequately show all major elements for the planning of the Project (the "**Site Plan**"), as well as and including an accurate scale model of the Project, all of which shall encompass the entire Site and the surrounding areas of influence.

1.1.6   Prepare full size, hard copy color renderings of the exterior of the Project and reproducible preliminary drawings, maintaining all as a record set. The color renderings and design shall be in a form suitable for exhibition, reproduction and publication, in such sizes, and hard copy and electronic formats, as the Owner might request. After the initial set of renderings and preliminary drawings, the cost of subsequent rendering sets is a Reimbursable Expense.

1.1.7   Prepare, and the Site Planning Phase will include, all submissions as may be required by any existing or potential lenders for the Project.

1.1.8.   Prepare for and execute, and the Site Planning Phase will include, those additional actions and requirements as are more particularly identified by the Owner on **Schedule 1.1.8** attached hereto.

1.1.9   Make such trips at such times and to such locations as the Owner shall designate, for the purpose of creating the architectural design and concept representations with respect to the Project. Out-of-pocket costs for any such trip will be considered a Reimbursable Expense to the extent provided Article III hereof.

1.2   Schematic Design Phase. If previously authorized in writing by the Owner, the Schematic Design Phase may commence contemporaneously with the Site Planning Phase and will terminate on the approval by the Owner of the Schematic Design Studies required hereunder. The Schematic Design Phase will consist of drawings and other documents (the "**Schematic Design Studies**") which: (a) illustrate the size, scope and character of the entire Project in its essentials, including, without limitation: (i) the architectural design elements; (ii) the kinds of materials; (iii) the type of structures; (iv) all of the MEPS Systems; (v) all of the Life Safety Systems; (vi) all of the ADA Systems; and (vii) such other Work (hereafter defined) as may be required and as may be necessary with respect to the development of the Site and the construction of the Project; and (b) are adequate so as to permit the Owner to: (i) obtain from the Contractor a guaranteed maximum price for the Project (sometimes herein called either, the

3

"**Guaranteed Maximum Price**" or the "**GMP**"); (ii) submit its application for interim and permanent financing for the Project; and (iii) meet with the approval of all necessary or appropriate parties as to the concept and design of the Project.  Without limitation to the preceding, the Schematic Design Studies will include:

1.2.1    A Site Plan showing all buildings, facilities and improvements in relation to projected grades with all proposed connections to existing or proposed roads and utilities, including, without limitation, identification and planned coordination with the CTUA and with all landscaping blocked in.

1.2.2    The type, location and specifications of all sub-surface soil, seismic and geotechnical investigations required.

1.2.3    Plans, elevations, typical cross-sections and typical wall sections and details of all buildings, facilities and improvements.

1.2.4    Reflected ceiling plans of all Project spaces showing proposed ceiling finishes and proposed lighting layouts.

1.2.5    All Project Systems, including all structural systems, electrical systems, mechanical systems, acoustical systems, PEMS Systems, Life Safety Systems and ADA Systems, presented in preliminary and one-line diagram form or as may be required by the Owner, in narrative form.

1.2.6    Preconstruction services, including, logistical planning, scheduling and, if so directed by the Owner, an evaluation and analysis of the Contractor's proposed GMP, the Owner's initial Construction Budget and construction sequence and schedule, each in terms of the other and including a value engineering report with respect thereto.

1.2.7    Typical floor and schematic plans for each type of Unit designated by the Owner, cross referenced to an included table setting forth gross and rentable areas for each Unit and each type of Unit, as well as for each Building located within the Project, using definitions therefor as provided or directed by the Owner.

1.2.8    Those additional specific Schematic Design Phase requirements and actions as are more particularly identified by the Owner on **Schedule 1.8** attached hereto.

1.2.9    Outline drawings and specifications describing all of the preceding, including all construction materials and all MEPS Systems, Life Safety Systems and ADA Systems, all in form and substance as directed by the Owner for:  (a) conceptual review by the Owner and by the Contractor's estimators; (b) in detail sufficient to support the determination of the Guaranteed Maximum Price; and (c) review by financial institutions and Governmental Authorities for code review purposes (collectively, the "**Outline Drawings and Specifications**").

The Architect agrees to complete the Site Plan and the Schematic Design Studies no later than July 31, 2012 and on the completion of the Schematic Design Studies, the Architect agrees that it will not perform any further work or services under this Agreement until it is authorized and directed to do so in writing by the Owner. Notwithstanding any other provision of this Agreement to the contrary, the Owner will have the right and option to terminate this Agreement by written notice to the Architect given at any time after completion of the Schematic Design Studies prior to the date on which the Owner may authorize the Architect to proceed with the Design Development Phase as provided in **Section 1.3**; on any such termination the Owner will have no further obligation to the Architect except to pay to the Architect any unpaid portion of the installments due under **Section 2.3(a)** hereof, to pay the Architect for any Additional Services rendered by the Architect to the date of termination, and to pay the Architect for any Reimbursable Expenses incurred by the Architect to the date of termination.

1.3    **Design Development and Construction Documents Phases.** As above referenced, the following phases will commence after completion of the Schematic Design Studies Phase and only, in each instance, on the written authorization from the Owner to the Architect proceed.

1.3.1    The Design Development Phase. The Design Development Phase will commence on the written authorization by the Owner to the Architect to proceed with the Design Development Phase and the Design Development Phase will terminate on the approval by the Owner of the Design Development Documents. As used herein, the "Design Development Documents" mean and must reflect: (a) all of the components of the Schematic Design Studies as finally approved by the Owner; (b) and include a further detailed development of the Outline Drawings and Specifications; and (c) include preliminary drawings and specifications in thorough detail; all of which will adequately describe the size, scope and character outline of the Project, including: (i) all of the Project Systems; and (ii) those specific Design Development Phase requirements and actions as are more particularly described by the Owner on **Schedule 1.3.1** attached hereto.

1.3.2    Construction Documents Phase. The Construction Documents Phase will commence on the written authorization by the Owner to the Architect to proceed with the Construction Documents Phase and will terminate on the approval by the Owner of the final Drawings and Specifications. In the Construction Documents Phase, the Architect will prepare drawings and specifications (the "**Drawings and Specifications**") that fully describe and delineate the entire Project (including any amendments thereto as may be required by the Owner) and which will be in such detail as is necessary to permit the construction and completion of the entire Project. The Drawings and Specifications will include the following items (all of which are sometimes herein called the "**Construction Documents**"):

(a)    Working drawings and specifications which fully delineate and describe: (i) all of the architectural work for the Project, incorporating all of the Project Systems (including without limitation as shown in the Preliminary Design Development Documents previously approved by the Owner, the PEMS Systems, ADA Systems and Life Safety Systems) as well as all Site development work for

5

the Project; (ii) all results of sub-surface soil investigations; (iii) all existing grades, new final grades, paving and curbs; (iv) all required utility service connections and lines; (v) all parking structures, related facilities and parking control systems; and (vi) all landscaping planting and related landscaping components; and

(b)    Specifications which will fully describe the scope, materials and quality of workmanship for the Project.

(c)    Details and elevations of all interior design features for all areas of the Project, including without limitation, all Units, all Clubhouse Facilities and all of the Common Area Facilities (including the Pool, the Marketing Facilities and models of each Unit type as might be required by the Owner) incorporating all necessary interior design work which:  (i) **will include** all design work for feature walls, millwork, counters, cabinetry, built-in casework, interior and exterior lighting, room finishes and specifications, appliance specifications (including all necessary or appropriate designs, criteria and placement plans), interior elevations, interior signage details and specifications, room key systems, security systems, and similar systems and reflected ceiling plans and designs; and (ii) which: (aa) **will include** with respect to the Hotel Suite Facilities and the Clubhouse Facilities, all of the preceding plus all design work related to furniture specifications (including all necessary or appropriate designs, criteria and placement plans), all other FFE (hereafter defined) to the extent related to the Hotel Suites Facilities and the Clubhouse Facilities (sometimes herein collectively called the "**Hotel FFE**") and all FFE Services (hereafter defined) related thereto (sometimes herein collectively called the "**Hotel FFE Services**"), with the Design Documents for all of the preceding sometimes herein collectively called the "**FFE Specifications**"; and (bb) **will exclude** with respect to those portions of the Project not included in the Hotel Suite Facilities and the Clubhouse Facilities (sometimes herein called the "**Apartment Facilities**") all of the above described design work not included in **Section 1.3.2(c)(i)** as not part of the Basic Services which are related to the FFE Specifications for the Apartment Facilities (such FFE Services excluded from part of the Basic Services are sometimes herein collectively called the "**Apartment FFE Services**"); provided, however, that: (1) on written request by the Owner, the Architect will perform all or any portion of the Apartment FFE Services as Additional Services at the Standard Hourly Rates, all as set forth in **Article IV** hereunder; (2) notwithstanding anything in the preceding to the contrary, the Basic Services will include, and the Design Documents will show, if requested by the Owner, wall outlets for all of the Apartment FFE as part of the Architect's electrical plan for the Project (with wall outlets for the Hotel FFE being already included as part of the Basic Services, as above provided); and (3) notwithstanding anything in the preceding to the contrary, the Basic Services, the FFE Specifications and the FFE Services will include for the entire Project, including both the Apartment Facilities and the Hotel Facilities, all appliance specifications (including all necessary or appropriate designs, criteria and placement plans).

(d)    In addition to the preceding, the Drawings and Specifications will include those requirements and actions as are more particularly identified·by the Owner on **Schedule 1.3.2(d)** attached hereto.

1.3.3    The Architect will provide assistance to either the Owner or the Contractor in applying for and obtaining permits and approvals of plans, specifications and contract documents from all federal, tribal, State, local, municipal or any other political subdivision thereof, including all judicial, legislative, or regulative administrative instrumentalities thereunder, having jurisdiction over the Project (individually, a "**Governmental Authority**", collectively, the "**Governmental Authorities**"), including all revisions and modifications as might be required.

1.3.4    In all instances, the initial and all amendments to the Drawings and Specifications will be subject to prior written approval by the Owner and will be subject to such changes as the Owner shall direct.

1.4    Bidding or Negotiation Phase.    The Architect, on request of the Owner from time to time, will assist the Owner in preparing bidding forms and obtaining bids, or negotiating proposals, for: (a) the construction of the Project and in awarding and preparing all construction contracts selected by the Owner; and (b) in accordance with the provisions of **Section 1.3.2(c)** above, the purchasing, storing, transporting and installing of all furniture, appliances, fixtures, equipment and materials for the Project (the "**FFE**") by the Purchasing Agents (hereafter defined) selected by the Owner, all to be performed in accordance with the FFE Bid Documents (hereafter defined) to be prepared by the Architect (sometimes herein collectively called the "**FFE Services**"). The Architect, on request of the Owner from time to time, will assist the Owner in reviewing any detailed cost and/or construction schedule estimates prepared by the Contractor and advising and consulting with the Owner with·respect to such detailed cost and/or construction schedule estimates.

1.4.1    As above referenced, the Owner may engage and hire one or more purchasing agents selected by the Owner (collectively the "**Purchasing Agent**") to provide the FFE Services and, as part of the Basic Services and when requested by the Owner, the Architect will prepare related bid documents for approval by the Owner, which fully delineate and describe in detail, the required actions necessary or appropriate for the.pricing, purchasing, storing, transporting and installing of the design FFE for the Project (collectively, the "**FFE Bid Documents**"). Thereafter, the Owner may enter into one or more purchasing agent services contracts (collectively the "**Purchasing Agent· Contract**,") with the Purchasing Agent upon terms and conditions acceptable to the Owner. As directed by the Owner, the Architect will interact with the Purchasing Agent on a continuing basis to determine and resolve any design, construction or installation criteria and, subject in each instance to the prior approval by the Owner, provide other pertinent directions to the Purchasing Agent related to the Project.

1.4.2    When so requested by the Owner, the Architect will assist the Owner with the selection of the Purchasing Agent by attending the interviews of potential purchasing

7

agents and will also assist the Owner in its efforts to identify and engage potential Purchasing Agents. Furthermore, the Architect, either as an Additional Service or as part of the Basic Services, all in accordance with **Section 1.3.2(c)** above, if and when requested by the Owner, will: (a) prepare additional furniture specifications and revisions to the FFE Bid Documents as the Owner may request; (b) review with the Owner the options, alternatives and procurement plans for the FFE; and (c) assist the Owner and the Purchasing Agent with documentation and negotiation relating to the manufacturers of, or the retailers for, the FFE. The Architect will further assist the Owner and the Purchasing Agent with such bidding process and with responses to questions regarding selections and design intent, all towards resulting in final selections by the Purchasing Agent which will be consistent with the initial and revised FFE Bid Documents approved by the Owner.

1.4.3    For purposes of clarification, it is understood that it is the Owner's intent that the Purchasing Agent will be responsible for ordering the FFE and then receiving and storing the FFE in a bonded and climate controlled warehouse until each piece or component of the FFE is to be transported to, and installed in, the Project. At such time, then: (a) the Purchasing Agent or the Contractor shall also be responsible for the transportation of the FFE to the Project and the installation of the FFE in the Project; and (b) the Architect will as part of the Basic Services: (i) provide assistance and oversight to the installation of the FFE in the Project by the Purchasing Agent; and (ii) will inspect the installation of the FFE to ensure its conformity to the FFE Bid Documents. In addition to the Certificates of Payment with respect thereto as required herein, the Architect will deliver such additional certificates to the Owner, as reasonably requested by the Owner, that certify to such conformity.

1.5    Construction Phase – Administration of the Project Contract.  The Construction Phase will commence upon written authorization from the Owner to the Architect to proceed and should be in conjunction with the award by the Owner of one or more of the general contracts to the Contractor and/or the Purchasing Agent, as applicable, who are responsible for the construction of the Project and/or the installation of the FFE; provided, however, the Owner, in the Owner's sole discretion, may elect to sequence the prosecution of the Work for the Project in multiple or sequential contracts for construction of the Project and/or the installation of the FFE (whether one or more, sometimes herein called the "**Project Contract**").  The Construction Phase will terminate when final payment is made by the Owner to the Contractor under the Project Contract with an estimated duration of the Construction Phase to be approximately twenty (20) months. The Architect will:

1.5.1    Provide general administration of the Project Contract and the general and supplemental conditions thereof in the manner contemplated thereby, subject at all times to the ultimate control and direction of the Owner.

1.5.2    Advise and consult with the Owner, and the designated representatives of the Owner during the Construction Phase, and unless otherwise directed by the Owner in writing, act on behalf of the Owner to the extent provided in the Project Contract.

8

1.5.3   Review and approve all shop drawings, materials, samples, schedules and colors submitted by the Contractor; and review and forward to the Owner all manuals, brochures and drawings needed for the operation and maintenance of the Project.

1.5.4   Prepare and distribute to all appropriate persons, including the Contractor, the Owner and their designated personnel, all bulletins, drawings, supplemental specifications and similar communications necessary to clarify or supplement the Drawings and Specifications during the Construction Phase.

1.5.5   Evaluate all proposals for changes in the Work and advise and consult with the Owner with respect thereto, and prepare all Change Order Requests to the Project Contract when approved by the Owner for submission to the Contractor.

1.5.6   In addition to those specific site visits set forth on **Schedule 1.5** attached hereto, make periodic visits to the Site for job meetings to render decisions in the field, to interpret drawings, and to submit written reports to the Owner not less frequently than monthly (and more frequently if requested by the Owner) to review and report on the progress of construction with recommendations as to materials and quality of the Work.

1.5.7   In addition to those specific site visits set forth on **Schedule 1.5** attached hereto, make weekly trips to the Site for architectural inspections and not fewer than monthly trips to the Site for structural inspections and for inspections of each of the Project Systems, during applicable construction phases for the systems, as part of the Basic Services during the Construction Phase.

1.5.8   Compile a final punch list prior to the final payment to the Contractor and notify the Owner of the status of punch list corrections.

1.5.9   Review Contractor's monthly payment request and approve as described in **Section 1.6** below by reviewing and, when appropriate, signing the Certificates for Payment.

1.5.10  Review Contractor's detailed cost estimates and advise and consult with the Owner with respect to such detailed cost estimates.

1.5.11  Perform those specific additional Construction Phase requirements and actions as are more particularly identified by the Owner on **Schedule 1.5.11** attached hereto.

1.6     General Duties of the Architect.

1.6.1   The Architect will at all times have access to the Work at the Site in order to perform the Architect's obligations hereunder.  On the basis of on Site observations as an architect professional, the Architect will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor.  Based on such observations at the Site and on the Contractor's Requests for Payment, the Architect will determine the amount

owing to the Contractor from time to time and will issue Certificates for Payment in such amounts. It is understood that the Architect will, as a part of the Architect's Basic Services hereunder, make such trips to the Site as are necessary to enable the Architect to fully perform and comply with these Certificates of Payment obligations, as well as its other obligations under this Agreement. The issuance of each Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's observations at the Site and the data comprising the Request for Payment, that the Work has progressed to the point indicated, that in the opinion of the Architect the quality of the Work is in accordance with the Construction Documents and the Project Contract (sometimes herein collectively called, the "**Contract Documents**") (subject to minor deviations from the Drawings and Specifications which are easily correctable prior to completion) and that the Contractor is entitled to payment under the Project Contract in the amount certified in the Request for Payment submitted by the Contractor as modified by the Architect. Notwithstanding the foregoing provisions or the furnishing of a full-time Project representative pursuant to the provisions of **Section 1.7** hereof, the Architect will not be responsible for construction means, methods, techniques, sequences or procedures of the Contractor, or for the safety precautions and programs in connection with the Work, or for the failure of the Contractor to carry out the Work in accordance with the Project Contract; but, notwithstanding the preceding, the Architect will be responsible for advising the Owner if the Architect, based on Site observations required hereunder as an architect professional, is aware, or should have been aware, that the construction means, methods, techniques, sequences or procedures will or might result in defects or deficiencies in the Work of the Contractor or the failure of the Project to conform to the Drawings and Specifications and the other Contract Documents.

1.6.2. The Architect will assist the Owner in interpreting the requirements of the Contract Documents and will assist the Owner in judging the performance by the Contractor thereunder. The Architect will render decisions on all claims of the Contractor relating to the execution and progress of the Work and on all other matters or questions related thereto, but all such decisions will be subject to the approval of the Owner.

1.6.3 The Architect will review and approve shop drawings, samples and other submissions by the Contractor for conformance with the design concept of the Project and for compliance with the information given in the Drawings and Specifications.

1.6.4 The Architect will evaluate all proposals for changes in the Work, advise and consult with the Owner with respect thereto and prepare all Change Order Requests requested and approved by the Owner for submission to the Contractor.

1.6.5 In addition to the Architect's Certificate of Payment obligation under **Section 1.6.1**, the Architect will conduct observations to determine the dates of substantial completion and final completion of the Work (whether the Work is phased or not), and will provide a certificate stating, as required by the Owner, the status of the Project with respect to either of the aforesaid completion stages. The Architect further will receive, review and forward to the owner written warranties and related documents

10

required by the Contract Documents and assembled by the Contractor, and will issue a final Certificate for Payment.

1.6.6   Other than for acts or omissions of the Architect's Representatives, the Architect will not be responsible for the acts or omissions of the Contractor, or any subcontractors, or any of the Contractor's, or subcontractor's agents or employees, or any other related persons performing any of the Work.

1.6.7   The Architect will have the authority to reject Work which does not conform to the Drawings and Specifications.  If the Architect considers it necessary or advisable to insure the proper implementation of the Drawings and Specifications, the Architect will have the authority to require special inspection or testing of any of the Work in accordance with the provisions of the Drawings and Specifications, whether or not such Work has been fabricated, installed or completed.

1.7   Project Representation Beyond Basic Services.

1.7.1   If more extensive representation at the Site than is described under the Construction Phase above is required, the Architect will, on the written request of the Owner, provide one or more full-time Project representatives to assist the Owner.  Each full-time Project representative will be, subject to the Owner's approval, selected, employed and directed by the Architect, and each full-time Project representative will be compensated at Standard Hourly Rates as defined in **Section 4.3** hereof.  In the event any Project representatives are requested by the Owner, the Architect will prepare and provide the Owner with an estimated budget of the cost of such Project representatives and, in no event, will the aggregate compensation for all Project representatives exceed the lump sum amount approved by the Owner and the Architect.

1.7.2   The full-time Project representatives, if requested by the Owner, will endeavor to provide further protection to the Owner against defects in the Work.  The duties, responsibilities and limitations of authority of each full-time Project representative will be as mutually agreed between the Owner and the Architect.

1.8   Insurance and Indemnity.

1.8.1   The Architect will obtain and maintain at all times during the performance of this Agreement, at the Architect's sole expense, the following types of insurance with limits not less than those set forth in each category below:

(a)   Errors and Omissions insurance ("**E&O**") having minimum limits for the Project exclusively of any other Project of ONE MILLION DOLLARS ($1,000,000.00) per occurrence and TWO MILLION DOLLARS ($2,000,000.00) in the aggregate.

(b)   Comprehensive General Liability ("**CGL**") insurance in a form providing coverage not less than that of standard comprehensive general liability

11

insurance coverages, having minimum limits for this Project (exclusive of any other project) of ONE MILLION DOLLARS ($1,000,000.00) per occurrence and TWO MILLION DOLLARS ($2,000,000.00) in the aggregate, including the following coverages: (a) personal injury liability coverage for claims arising out of the Work contemplated hereby for personal injury and bodily injury (including death); and (b) property damage.

(c)    Umbrella insurance coverage in addition to the above described CGL insurance and other coverages herein required , containing a minimum limit of ONE MILLION DOLLARS ($1,000,000 per occurrence and TWO MILLION DOLLARS ($2,000,000.00) in the aggregate.

(d)    The insurance coverages required herein will include automobile, hired automobile and non-owned automobile coverages having minimum limits of ONE MILLION DOLLARS ($1,000,000.00) per occurrence), including combined single limit, bodily injury and property damage amounts acceptable to the Owner.

(e)    Workers' compensation insurance as required by the State of Oklahoma and all other Governmental Authorities having jurisdiction, covering the operations of the Architect, its agents and Permittees, performed in connection with the Work at, or away from, the Project.

1.8.2  All policies of insurance secured and maintained by the Architect hereunder will be maintained for a period of not less than one (1) year after the date of final completion, will provide for a deductible of not more than and TEN THOUSAND DOLLARS ($10,000.00) per occurrence and THIRTY THOUSAND DOLLARS ($30,000.00) in the aggregate, and will be endorsed to provide that the insurer will notify the Owner at least thirty (30) days prior to the effective date of any cancellation or modification thereof.    The Architect on its own behalf and on behalf of its Representatives and Designees (sometimes individually and collectively called, the "Insuring Parties"), hereby releases the Owner and its Representatives and Designees, individually and collectively, from all liability for loss, damage or expense due to any act, neglect, fault or omission which is, or was intended, to be covered by insurance that the Insuring Parties are now carrying, are requested to carry under this Agreement or which may be hereafter carried. All such policies shall, additionally, be in such form and upon such terms and conditions as are acceptable to the Owner and shall include, by way of illustration but not limitation, a provision whereby such insurance company or companies consent to the aforesaid release of liability by the Architect and further waive all rights of recovery by way of subrogation against the Owner, its Representatives and Designees, respectively, in connection with any loss or damage covered by such policies.   The Architect will, on or before ten (10) days after the date hereof, furnish the Owner with certificates of insurance setting forth that the above-described policies and coverages are in full force and effect and reflecting that the Owner is covered thereby. If the terms of coverage (other than limits set forth above) of such policies are unacceptable to the

Owner, the Architect will revise such coverage or obtain such additional coverage as is requested by the Owner.

    1.8.3  The above policies, except for the E&O coverages, shall specifically state that the Owner and all designated Representatives of the Owner are listed as additional insureds.  The Architect shall furnish the Owner and any property manager(s) Certificates of Insurance evidencing such coverages.

    1.9   Architect's Representatives.  The following persons are hereby designated as the persons in charge of the services to be performed by the Architect under this Agreement:

| | |
|---|---|
| Richard R. Brown: | Principal in Charge and Project Architect |
| Troy O. Downing: | Senior Architect |
| Malia Tate: | Design Architect |

As the Architect's representatives, such persons will participate in and will at all times be completely familiar with the performance by the Architect of the Architect's services hereunder and will serve as the prime points of contact between the Owner and the Architect.  The persons designated will not be changed, except with the written approval of the Owner.  In the event that any one of such persons ceases to be a partner or in the full-time employ of the Architect, such person will be promptly replaced with a professionally qualified person acceptable to the Owner.

    1.10   Quality of Work.  The Architect represents to the Owner that after due investigation and to the best of the Architect's knowledge and belief that the Construction Documents will be in compliance with all applicable Laws (including all building and zoning codes) applicable to the Project.  Except as otherwise expressly provided in Section 6.4, the Architect agrees that the Architect will be liable to the Owner for any defects and deficiencies in the Construction Documents and to the consequences arising therefrom and that the Construction Documents will be satisfactory for the purposes intended.

    1.11   Schedule of Completion of Phases.  Upon the earlier to occur of:  (a) the agreement between the Owner and the Contractor upon a Guaranteed Maximum Price; (b) the execution and delivery of the Project Contract; and (c) the commencement of the Construction Phase; the Owner, Architect and Contractor, if applicable, will consult and mutually agree on a progress schedule setting forth the time of completion of such phase of construction and all succeeding phases of construction and setting forth the time of completion of the various stages of each such phase of construction (the "Progress Schedule"); provided, however, as of the Effective Date, it is the intent of the parties that all construction of the Work and the Project shall be completed by, and the date of final completion shall occur on or before, twenty (20) months from the date of commencement of construction of the Project.  In the event the Owner and the Architect cannot agree at the commencement of the Construction Phase on the completion dates to be set forth in the Progress Schedule, then the Owner will have the right to terminate this Agreement for cause.  If requested to do so by the Owner in writing, the Architect will prosecute certain portions of the Architect's Basic Services in preference to others and the Progress Schedule will be adjusted appropriately.  The parties acknowledge that the completion dates to be set forth in the Progress Schedule are of paramount consideration to the Owner and that

timely performance of the obligations herein undertaken by the Architect to conform the timing of the performance to the construction completion dates is of the essence of this Agreement. If the Architect is rendered unable to complete the Architect's work in accordance with the Progress Schedule because of an Event of Force Majeure, then the provisions of **Section 9.6** will apply.

ARTICLE II

Architect's Compensation

2.1    Basic Fee. The Owner agrees to pay the Architect as compensation for his Basic Services set forth in Article I hereof, a basic fee (the "**Basic Fee**") equal to the sum of **THREE HUNDRED FORTY FOUR THOUSAND TWO HUNDRED SEVENTY-FIVE DOLLARS ($344,275)**, constituting an amount equal to the sum of: (a) the product of: (i) the two hundred fifty-two (252) Units in the Project, multiplied by (ii) the amount of One Thousand Two Hundred Dollars ($1,200) per Unit; and (b) the amount of Twenty-Five Thousand Dollars ($25,000) constituting the Basic Fee for the Basic Services to be rendered with respect to the Clubhouse Facilities and Common Area Facilities for the Project. Additionally, Reimbursed Expenses (hereafter defined) are addressed in Article III herein.

2.2    Excessive Construction Cost. In the event the Owner and the Contractor after consultation with the Architect are unable to agree to a Guaranteed Maximum Price acceptable to the Owner, the Architect (without additional charge and as a part of the Basic Services) will recommend value engineering advice and other proposed modifications to elements of the original basic concept for the Project, with the aim of bringing the construction cost of the Project within the Owner's budget limitations.

2.3    Payments to the Architect. Payments of the Basic Fee will be made monthly in proportion to the Architect's services performed during the prior month determined in accordance with approved payment certificates described in **Section 2.4**, allocable to the Phases of the Architect's work as follows:

| | | |
|---|---|---|
| (a) | Site Planning Phase - Schematic Design Phase | 15% |
| (b) | Design Development Phase | 20% |
| (c) | Construction Documents Phase | 40% |
| (d) | Bidding or Negotiation Phase | 5% |
| (e) | Construction Phase | 20% |

2.4    Payment Certificates. In order to determine the amount of services performed by the Architect during each month in which payments are due as set forth in **Section 2.3**, the Architect, on or before the tenth (10th) day of each month, will present to the Owner a signed

14

invoice accompanied by appropriate supporting information showing the percentage of the Architect's services performed during the immediately preceding month for the particular phase in which the Architect is then engaged. Once each payment certificate has been approved by the Owner, the monthly payments required under such **Section 2.3** will be made on the basis of such payment certificates and invoices on or before the 60th day following the date of approval by the Owner of such payment certificate, invoice and appropriate supporting information.

2.5 <u>Lien Releases and Waivers</u>. As a condition to each payment by the Owner to the Architect hereunder, the Architect will furnish to the Owner, if requested by the Owner, full, adequate and complete releases of liens and rights to liens in form reasonably satisfactory to the Owner with respect to the payment to be made.

2.6 <u>Extended Administration</u>. If the construction of the Project is not substantially complete within twenty-four (24) months after the date on which construction commences, through no fault of the Architect, the services required after such twenty-four (24) month period to complete the administration of the Project Contract will be compensated by the payment to the Architect of an amount equal to the Standard Hourly Rates (as defined in **Section 4.3**) of the Architect plus the Architect's Reimbursable Expenses incurred in connection therewith. Compensation for such extended administration will be in addition to the Basic Fee.


### ARTICLE III

#### Reimbursable Expenses

3.1 <u>Enumeration of Expenses</u>. As used herein, "**Reimbursable Expenses**" are reasonable expenses actually incurred by the Architect, its employees or its consultants in the interest of the Project and which represent sums to be paid to the Architect by the Owner in addition to the Basic Fee and fees for Additional Services (hereafter defined), including the following:

3.1.1 Fees of special consultants for civil engineering services in excess of those provided by the Site Civil Engineer and other than for engineering services for the PEMS Systems, Life Safety Systems and ADA Systems and other customary or normal engineering services for projects of this nature all of which are a part of the Basic Services and included in the Basic Fee. In all instances, each consultant retained by the Architect shall have been approved by the Owner, it being understood that the Architect will not have the right to engage any consultant to assist the Architect in performing the Architect's obligations hereunder (including any consultants whose fees would not constitute a Reimbursable Expense) without the prior written consent of the Owner.

3.1.2 Building permit fees and other similar fees assessed by any Governmental Authority having jurisdiction over the Project.

15

3.1.3   Expenses of printing materials or other costs incurred in the preparation of specifications, brochures or other promotional type materials, including project specification books.

3.1.4   Expenses of courier services, shipping and delivery charges.

3.2   Excluded Expenses.   The Architect will not charge the Owner for expenses incurred by the Architect for the following:

3.2.1   Expenses of travel or transportation and living expenses of the Architect's principals, employees and Permittees for trips to the Site.

3.2.2   Expenses of telephone, facsimile, computer (Wi-Fi and broadband) services and similar charges.

3.3   Reimbursable Expense Statements.   The Architect may send the Owner a statement with respect to Reimbursable Expenses incurred by the Architect in the immediately preceding month, setting forth in reasonable detail the expenses for which reimbursement is sought and the Architect will be entitled to be reimbursed only for those expenses set forth in the statement.   Payments for reimbursement of expenses will be made on or before the 60th day of the calendar month following the date of presentation by the Architect of the statements accompanied by appropriate supporting data.   Additionally, the Architect will prepare and provide the Owner with an estimated budget of the cost of the Reimbursable Expenses related to the Project within ten (10) days following execution of this Agreement and in no event will Reimbursable Expenses: (a) exceed the Architect's actual out of pocket expenses or include any increase or markup thereto; or (b) exceed the sum of FIFTEEN THOUSAND DOLLARS ($15,000) in the aggregate for the entire Project.

## ARTICLE IV

### Additional Services

4.1   Enumeration of Additional Services.   As used herein, "Additional Services" shall mean those services set forth below and any other services beyond the Basic Services which the Owner may request in writing.   The Architect will be compensated at the Standard Hourly Rates involved in performing the Additional Services and will be reimbursed for Reimbursable Expenses incurred in connection therewith.   The Architect agrees to perform such Additional Services if requested to do so in writing by the Owner; however, no Additional Services will be performed without the prior written authorization of the Owner:

4.1.1   Making of additional planning or economic surveys over and above those previously identified as a Basic Service.

4.1.2   Preparation of revisions to approved Drawings or Specifications to incorporate approved Change Orders to the Project Contract to accomplish changes

pursuant thereto, unless the changes are required as a result of the Architect's errors or omissions (any services rendered in connection with Change Orders initiated by the Architect without the Owner's approval will not be considered as Additional Services and will be performed by the Architect as part of the Basic Fee); for purposes of clarification, but not limitation, any decision by the Owner to expand the Hotel Suite Facilities to more than one building will be implemented by a Change Order to the Project Contract and the Architect's revisions to the Drawings and Specifications shall be an Additional Service rendered at the Standard Hourly Rate.

4.1.3  Consultation concerning replacement of any Work damaged by fire or other cause not attributable to the Architect during construction and furnishing professional services of the types set forth in Article I as might be required in connection with the replacement of such Work.

4.1.4  Preparation of reproducible record drawings showing significant construction changes in the Work during the Construction Phase based on data furnished by the Contractor.

4.1.5  Rendering any further services in connection with the Project following the final payment to the Contractor by the Owner except services resulting from errors or omissions of the Architect.

4.1.6  Providing services of an independent testing agency to conduct a wind tunnel test program.  The cost of such program will be subject to the prior written approval of the Owner.  If the tests of the Architect's initial design are negative, any further tests will be at the sole expense of the Architect and such expense will not constitute a Reimbursable Expense.

4.1.7  Providing services required to obtain any LEED Certification, energy modeling or any other extensive environmental design alternatives for the PEMS System, if and when requested or authorized by the Owner.

4.1.8  As referenced in **Sections 1.3.2(c)**, **1.4.1**, **1.4.2** and **1.4.3**, the Architect will provide all necessary interior design services for the Project, including as part of the Basic Services, in consideration of the Basic Fee and for no additional consideration, the design by the Architect of:  (a) all typical spaces for the various Unit types and structures set forth in Recital A, as well as all Project Systems, and lighting, partitions, flooring, doors, hardware, appliances, interior surfaces, sprinkler and electrical distribution systems relating to each such Unit, structure and the Clubhouse Facilities and the Common Area Facilities; (b) all other items and areas within the Clubhouse Facilities and the Common Area Facilities within the Project, including without limitation, lobbies, space for mechanical purposes, access corridors and public access rest rooms; and (c) however with respect to the FFE Services relating to all of the preceding:  (i) all Hotel FFE Services are included as part of the Basic Services in consideration of the Basic Fee; (ii) all Apartment FFE Services which are not included in **Section 1.3.2(c)(i)** as part of the Basic Services will, if requested by the Owner, be an Additional Services rendered at

17

the Standard Hourly Rate; and (iii) in all events, all appliance design and specification work (including all necessary or appropriate design criteria and placement plans) shall be included as part of the Basic Services for the entire Project, including both the Apartment Facilities and the Hotel Facilities.

4.1.9   Civil engineering services for the development of the Site in excess of those provided by the Site Civil Engineer (other than normal engineering services for PEMS Systems, Life Safety Systems, ADA Systems and environmental engineering which are to be included in the Basic Fee).

The cost of the services of special consultants requested or authorized by the Owner for the Project (other than the above referenced normal engineering services for PEMS Systems, Life Safety Systems, ADA Systems and environmental engineering which are to be included in the Basic Fee) will be charged at the actual cost to the Architect for such services.

4.2   Payment for Additional Services.   Payments for any Additional Services of the Architect defined in **Section 4.1** will be made monthly in conjunction with the presentation of the Architect's payment certificate described in **Section 2.4** setting forth in detail acceptable to the Owner a description of each such service rendered, along with such supporting information as the Owner might reasonably require.

4.3   Direct Personnel Expense.   As used herein "Direct Personnel Expense" means and is limited to the "**Standard Hourly Rates**" set forth on Schedule 4.3 attached hereto, of the Architect's professional employees directly engaged on the Project, and the professional employees of any special consultant approved by the Owner who are directly engaged on the Project in performing consultation, design and contract administration, and in producing drawings, specifications, project reports and other documents pertaining to the Site.  As used herein, the application of Standard Hourly Rates will not include overtime, overhead or any allocation of employee benefits beyond the applicable Standard Hourly Rates, unless approved in advance by the Owner.  In no event, however, will charges involving the application of Standard Hourly Rates include time of general overhead personnel such as bookkeepers, secretaries, clerks and other general office persons.

4.4   Special Consultants' Fees.   For the cost of services of special consultants requested or authorized by the Owner for the Project (other than for those provided by the Site Civil Engineer and other than for normal engineering services for PEMS Systems, Life Safety Security Systems, ADA Systems and environmental engineering which are to be included in the Basic Fee), the Architect will be compensated at the actual cost to the Architect for such services, determined in accordance with the actual Standard Hourly Rates for such consultant, provided that such are applied consistently to customary clients of that consultant.

## ARTICLE V

### Owner's Responsibilities

5.1     Project Program.  The Owner will provide information and general criteria in the form of a written project program outlining the requirements for the Project (the "**Project Program**").  The Architect acknowledges that the Owner has provided a Project Program to the satisfaction of the Architect prior to the execution of this Agreement.

5.2     Designation of Representatives; Approval of Documents.   The Owner will maintain close liaison with the Architect, and through the Architect, with the Architect's consultants, if any.   The Owner may, from time to time, designate by written notice to the Architect, a "**Project Manager**", who will act as the primary point of contact for the Architect for the Project, although the Architect acknowledges that the Project Manager will not have the authority to amend this Agreement, nor to modify the Architect's obligations hereunder and will provide no supervisory assistance to the design or construction of the Project.  The Owner will examine documents submitted by the Architect and will render decisions pertaining thereto promptly to avoid unreasonable delay in the progress of the Architect's work.

5.3     Surveys and Subsurface Investigations.  The Owner will furnish topographic and boundary surveys of the Site, showing, as required: streets, alleys, pavements and adjoining property; rights of way, restrictions, easements, encroachments, deed restrictions, boundaries and contours of the Site; locations, dimensions, and available data pertaining to existing buildings, other improvements and trees; and full information concerning service and utility lines both public and private, above and below grade, including inverts and depths.  The Architect will determine what test borings, pits, or other subsurface soil investigations are necessary for the determination of subsurface conditions.   Subsurface tests of any kind (including without limitation seismic and hydrographic tests) will be located, specified and inspected by the Architect but contracted and paid for by the Owner.  The Architect will be responsible for:  (a) the adequacy of such subsurface soil investigations with regard to the type and number necessary under the particular conditions prevailing at the Site; (b) the proper interpretation and application of the recommendations of such investigations; and (c) the integrity of all structures and Site improvements based on the results of such investigations.

5.4     Bidding Information.  As part of its Basic Services, the Architect will assist the Owner in providing, or at the direction of the Owner will provide, prospective bidders with all bidding information and bidding documents.

## ARTICLE VI

### Termination

6.1     Termination without Cause.  The Owner may terminate this Agreement, without cause, on fifteen (15) days written notice to the Architect.  In the event of termination under this **Section 6.1**, the Architect will be compensated as follows:

19

6.1.1  If such termination occurs prior to the commencement of the Construction Documents Phase, the Architect will not be entitled to any additional compensation for Basic Services over and above the installment payments due under **Sections 2.3(a)** and **(b)** hereof;

6.1.2  If such termination occurs at any time after the commencement of the Construction Documents Phase, the Architect will be paid a lump sum amount for Basic Services necessary to increase the total compensation to that amount which would have been received by the Architect in accordance with **Section 2.3** had the Architect completed the particular phase in which the Architect was engaged at the time of such termination;

6.1.3  In addition to the above, in the event of such termination, the Architect will receive payments for any Additional Services rendered and for Reimbursable Expenses incurred to the date of such termination.

On payment of the foregoing amounts by the Owner to the Architect, the Architect will not be entitled to any further compensation and will have no further rights hereunder.  Notwithstanding anything hereunder to the contrary, the Owner will also have the right to terminate this Agreement after the completion of the Schematic Design Studies as provided in **Section 1.2**.

6.2    **Termination with Cause.**  Subject to the Force Majeure and Owner's Suspension provisions of **Section 9.6** hereunder, this Agreement may be terminated by either party, on ten (10) days written notice, should the other party hereto fail to substantially perform in accordance with the terms hereof, through no fault of the terminating party.  In addition, the Owner may terminate this Agreement on ten (10) days written notice to the Architect if:  (a) the Owner, in the Owner's discretion, determines that the Project is to be abandoned; or (b) any two or more of the representatives of the Architect named in **Section 1.9** die or become incapacitated or for any reason cease to be in the full-time active employment of the Architect or fail to continue primary assignment to the Project.  Additionally, the Owner will be entitled to terminate this Agreement without notice to the Architect and for cause if the Architect or any principal or partner of the Architect files a voluntary petition in bankruptcy or is adjudicated as bankrupt or insolvent, or files any petition or answer seeking any relief under the present or any future federal bankruptcy act or any other present or future or applicable Law of any Governmental Authority having jurisdiction relative to bankruptcy, insolvency or other relief for debtors, or seeks or consents to or acquiesces in the appointment of any trustee, receiver, conservator or liquidator of any substantial part of its or his or her properties.  In the event of any termination under this **Section 6.2**, the Architect will be paid for services performed as of the date of such termination as hereafter set forth:

6.2.1  If such termination is through no fault of the Architect, the Architect will be entitled to payment of the Basic Fee for Basic Services to the date of such termination in accordance with the proportionate installment provisions set forth in **Section 2.3**, plus payment for Additional Services rendered and for Reimbursable Expenses incurred to the date of such termination; or

20

6.2.2   If such termination is due to the failure of the Architect to perform the Architect's obligations hereunder, the Architect will be paid for such amount as is equitable under the circumstances (provided that in no event will such amount exceed the amount otherwise payable by the Owner for work actually completed by the Architect to the date of termination). If the Owner and the Architect are unable to mutually agree on the amount to be paid within thirty (30) days after termination, the Owner will fix an amount which the Owner deems appropriate in consideration of all of the circumstances surrounding such termination and will make payment accordingly. The Architect's sole remedy thereafter will be for recovery of any additional sums which the Architect considers to be due for the Architect's services hereunder by virtue of the non-binding mediation and dispute resolution process more particularly described in Article VIII hereunder. No termination by the Owner of this Agreement as a result of a default by the Architect hereunder will preclude pursuit of any other remedies of the Owner with respect to such default, including the recovery of damages suffered as a result thereof.

6.3    Use of Drawings.  In the event of a termination of this Agreement, it is agreed that:

6.3.1   In the event the Owner terminates this Agreement prior to the commencement of the Construction Phase of the Project, the Owner will not have the right to use the ideas, designs and other matters therein contained for the completion of the Project unless the Owner, after having determined to abandon the Project, determines afterwards to complete the Project and gives the Architect the option of rendering the remaining architectural services for the completion of the Project on the same basis as set forth in this Agreement.

6.3.2   In the event the Owner terminates this Agreement for any reason after commencement of the Construction Phase of the Project, the Architect will deliver to the Owner reproducible originals in an electronic data format approved by the Owner (whether CADD, AutoCAD or otherwise) of all the Drawings and Specifications and related materials prepared to the date of termination and the Owner will have the right to use the ideas, designs and other matters therein contained for the completion of the Project.

6.3.3   In all events, and regardless of whether this Agreement is terminated by either party, the Architect will supply to the Owner a full copy of the Drawings and Specifications and all Project Systems engineering calculations for the Project.

6.4    Architect's Liability.  If the Owner terminates this Agreement for any reason after the commencement of the Construction Phase but before the Construction Phase is completed, then the Architect will be liable for any defect or deficiency in the design features of the Construction Documents that are incorporated into the Work after the date of termination.

6.5    Replacement Architect.  In the event this Agreement is terminated for any reason and the Owner proceeds to complete the Project with the assistance of another architect, the

parties acknowledge the importance for the protection of both parties of providing the Architect the opportunity to consult with the replacement architect concerning the Drawings and Specifications and give the replacement architect the Architect's interpretation of the Drawings and Specifications to fully acquaint the replacement architect with the scope and meaning of the Drawings and Specifications intended by the Architect. Accordingly, the Owner agrees to use good faith efforts to attempt to arrange those meetings between the replacement architect and the Architect for the purpose of having discussions of such nature.

6.6     Cumulative Effect.   The liabilities of the Architect expressed herein are cumulative of each and every other liability which the Architect might otherwise have at law or in equity; the rights and remedies of the Owner hereunder are cumulative of each and every other right or remedy which the Owner might otherwise have at law or in equity; and the exercise of one or more rights or remedies will not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

## ARTICLE VII

### Ownership of Plans; Architect's Records

7.1     Ownership of Documents.   All drawings, plans, specifications, renderings, other documents and models prepared by the Architect for the Owner in connection with the Project (including without limitation all Site Planning Studies, Schematic Design Studies, Outline Drawings and Specifications, Design Development Documents, Drawings and Specifications and the Construction Documents, all of which along with this Agreement are sometimes herein collectively, the "**Design Documents**") will be the property of the Owner. Such items will not, however, be used by the Architect, the Owner or any other Person on any project other than this Project unless expressly authorized in writing by the Owner and the Architect.

7.2     Architect's Accounting Records.   Records of the Architect's hourly charges based upon the Architect's Standard Hourly Rate, consultant's expense, Reimbursable Expenses, Additional Services and records of accounts between the Owner and the Architect will be kept on a generally recognized accounting basis and will be available to the Owner at reasonable times during ordinary business hours and may be copied by the Owner. The Owner will be permitted to review work in progress at the Architect's office at reasonable times during ordinary business hours.

## ARTICLE VIII

### Resolution of Disputes

8.1     Mediation.   If the Architect has a claim against the Owner, the Architect will first request mediation. The mediation will be conducted by a Person designated (the "**Mediator**") by the Owner. The mediation shall be conducted as follows:

22

8.1.1   The Architect shall be given time to state its case and present arguments and evidence before the Mediator with the Owner's representatives present.

8.1.2   The Owner shall be given a similar time to respond before the Mediator with the Architect present.

8.1.3   The Mediator shall meet with the Architect alone.

8.1.4   The Mediator shall meet with the Owner alone.

8.1.5   The Mediator shall meet with both the Owner and the Architect to discuss points of agreement and contention.

8.1.6   During the process described in steps 8.1.1 and 8.1.2, the Mediator shall listen and make direct inquiry to identify facts.

8.1.7   During the process described in steps 8.1.3 and 8.1.4, the Mediator shall direct the parties toward agreement by comments, questions and legal evaluation of facts stated.

8.1.8   During Step 8.1.5 as well as in earlier stages, the Mediator shall suggest solutions agreeable to both parties and endeavor to establish concurrence.

8.1.9   Failing agreement of the parties, the Mediator shall prepare a complete report of the proceedings to the Owner and the Architect.

8.2   <u>Venue; Governing Law</u>.  This Agreement is being executed, delivered and is intended to be performed in Love County, Oklahoma and will be governed by and construed in accordance with the substantive laws of the State of Oklahoma, without respect to conflicts of law principles.

8.3   <u>Full Liability; Indemnification</u>.  Notwithstanding any other provision of this Agreement to the contrary, the Architect will be liable for, and hereby indemnifies and agrees to defend and hold the Owner and the Owner's managers, members, officers, directors, partners, employees, shareholders, owners, Representatives and Designees harmless from and against any and all claims, demands, losses, costs, damages and expenses of every nature whatsoever resulting from or relating to the Architect's performance of its duties under the Contract Documents and to any defect or deficiency in the design features of the Construction Documents and to all other similar or related claims, demands, losses, costs, damages and expenses, all of which shall include judgments, penalties, interest, court costs and legal fees incurred with respect thereto, as well as consequential damages and lost profits resulting therefrom or relating thereto.

8.4   <u>Certain Definitions</u>.  As used herein, the respective successors and assigns of the Owner, and when context so requires, of the Architect, and, when so designated, their agents, equity holders, directors, officers, employees, administrators, trustees, managers, members and all other Persons (hereafter defined) acting as their designated servants (sometimes herein

23

collectively called their "**Representatives**"), as well as their and their Representatives' invitees, licensees, customers, tenants' respective Representatives as may be authorized, designated and permitted by that Person (individually a "**Designee**" and collectively, the "**Designees**") and those successors, assigns, Designees and Representatives of a Designee as, in each and every instance, such Person might from time to time authorize or designate (individually, a "**Permittee**", and collectively, the "**Permittees**").   As used herein, "Person" shall mean any individual, corporation, limited liability company, trust, joint venture, association, limited or general partnership or any other entity properly formed or existing under applicable Law.

## ARTICLE IX

### General Provisions

9.1    Successors and Assigns.  The Owner and the Architect bind themselves and their respective successors and permitted assigns and Representatives to each other and to· the respective successors and permitted assigns and Representatives of the other party with respect to this Agreement. The Owner may assign, subcontract or transfer the Owner's interest in this Agreement without the written consent of the Architect; however, the Architect may not directly or indirectly assign, subcontract or transfer the Architect's interest in this Agreement without the prior written consent of the Owner, which consent may be withheld or not in the Owner's sole discretion.   No assignment, subcontracting or transfer will relieve either party from the responsibility for its performance of this Agreement.·

9.2    Extent of Agreement.  This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations and agreements, whether written or verbal. The Recitals and the preamble set forth at the beginning of this Agreement, and all Exhibits and Schedules attached hereto, are incorporated herein and by this reference are made a part of this Agreement. This Agreement may be amended only by a written instrument signed by the Owner and the Architect.

9.3    Advertising and Promotion.  The Owner is and will remain in exclusive, full and complete control of all advertising, publicity and promotional use of any and all materials, information, concepts and other matters pertaining to the Project (including any public dissemination, publicity or disclosure of the existence of this Agreement, the Architect's involvement with the Project or the probability that the Project may occur), and no such use will be made by the Architect without the Owner's prior approval of the form and substance thereof, as determined in the Owner's sole discretion.  All plans, renderings, models and other matters will identify the Owner and the Architect in a form and manner directed by the Owner.

9.4    Execution of Documents by the Architect.  The Architect agrees to execute such consents and other documents (including amendments to· this Agreement) as any lender for the Project might reasonably require to enable the Owner to obtain financing for the Project; provided, that in no event will the Architect be obligated to execute any document the effect of which is to impose liability of any kind on the Architect (other than for performance of the

24

Architect's obligations hereunder) or which results in the waiver or relinquishment by the Architect of any right which the Architect might hereunder have.

**9.5** _Indemnification by Contractor._ In the Project Contract between the Owner and the Contractor, the Owner will use reasonable efforts to include provisions:

**9.5.1** Binding the Contractor to protect, indemnify and hold Architect and its Representatives free and harmless from and against any and all claims, liens, demands, and causes of action of every kind and character including the amount of judgments, penalties, interest, court costs and legal fees incurred by Architect in defense of same, arising in favor of Governmental Authorities or third parties (including agents and employees of Contractor or any subcontractor) on account of taxes, claims, liens, debts, personal injuries, death, or damage to tangible property (other than the Work itself), and without limitation by enumeration all other claims or demands of every character occurring or in anywise incident to, in connection with or arising out of the Work to be performed by Contractor under the Project Contract pursuant to the Contract Documents; provided, however, that the obligations of Contractor under this Section shall not extend to any claims arising out of:  (a) the giving of or the failure to give directions or instructions by the Architect, its Representatives or consultants, which directions or instructions were required pursuant to the provisions of the Contract Documents, or reasonably inferable therefrom; or (b) liability for bodily injury or death to Persons or damage to property of Owner or its respective Representatives, Permittees or Designees, or any Person or expenses in connection therewith, caused by or resulting from defects in plans, specifications or any of the Construction Documents, the Design Documents or the Contract Documents prepared, approved or used by the Architect or the negligence of the Architect in the rendition or conduct or professional duties called for or arising out of the Construction Documents, the Design Documents or the Contract Documents; and

**9.5.2** That in any and all claims against the Architect or any of its Representatives by any Representative of the Contractor or any subcontractor thereof, or of anyone directly or indirectly employed by any of them, or by any Person for whose acts any of them may be liable, the foregoing indemnification obligation of Contractor shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Contractor or any subcontractor under any worker's compensation acts, disability benefit acts or other employee benefit acts.

**9.6** _Force Majeure._ As used in this Agreement an "Event of Force Majeure" will have the following meanings and will be dealt with in the following fashion:

**9.6.1** If any event or circumstance prevents or delays the performance by a party hereto of its obligations under this Agreement and that event or circumstance arises out of any cause beyond the reasonable control of the party invoking this provision, the affected party's performance shall be excused and the time for performance shall be extended, except as otherwise provided at **Section 9.6.5** below, for the period of delay or inability to perform due to such occurrence, provided the non-performing party had taken all reasonable precautions to avoid the delay or nonperformance and the delay or inability to

perform did not result from the fault or negligence of the non-performing party (an "Event of Force Majeure").

9.6.2    Subject to the other provisions of this __Section 9.6__, where either party hereto is prevented from performing its obligations under this Agreement by an Event of Force Majeure, the obligations of both parties shall be suspended for the duration of such Event of Force Majeure and neither party shall be liable to the other for failing to perform those obligations.

9.6.3    A party hereto whose performance is affected by an Event of Force Majeure shall promptly give the other party notice of the occurrence of the Event of Force Majeure, its anticipated affect on the party's performance under this Agreement, any significant change in the nature of the Event of Force Majeure, any progress made in curing or eliminating the effects of the Event of Force Majeure, the termination of any Event of Force Majeure, and the anticipated date of the party's resumed performance of its obligations under this Agreement.

9.6.4    A party hereto which fails to fulfill its obligations because of an Event of Force Majeure shall use all reasonable diligence to minimize or eliminate the Event of Force Majeure, but shall not be required to settle a strike, work stoppage, or other labor dispute, and shall otherwise fulfill its obligations as soon as reasonably possible after the elimination of the Event of Force Majeure.

9.6.5    If an Event of Force Majeure prevents or delays a party's performance for more than thirty (30) consecutive days or the party who is not prevented from performing due to the Event of Force Majeure reasonably believes that the Event of Force Majeure will prevent or delay the other party's performance for more than thirty (30) consecutive days, then the party whose performance is not affected by the Event of Force Majeure may terminate this Agreement at any time during that Event of Force Majeure by providing the other party with written notice of the date of that termination.

9.6.6    Notwithstanding anything hereunder to the contrary, the Owner may, at any time, from time to time, and without cause, suspend the performance of the Basic Services by the Architect for a period of up to ninety (90) consecutive days by delivery of written notice to the Architect, without such causing an Event of Force Majeure or a default hereunder.  Such notice shall fix the date on which the Architect shall resume performance of the Basic Services and the Architect shall resume the Basic Services on such date.  On the occurrence of any such suspension by the Owner, the Architect will be entitled to payment of the Basic Fee for Basic Services rendered to the date of the suspension, plus payment for Additional Services rendered and for Reimbursable Expenses incurred to such date.  Once the Architect recommences performance of the Basic Services after the period of suspension, the Architect will be entitled to payments of the installments of the Basic Fee, and payments for Additional Services and Reimbursable Expenses, as herein provided.

9.7    Notices.  All notices and responses required or permitted to be given hereunder will be deemed to be given and received on the **earlier of**:  (a) when actually received by the

26

Architect or the Owner, as the case might be; (b) the next business day following the deposit of such notice with a nationally recognized overnight courier for next day delivery, with delivery confirmation received; or (c) seventy-two (72) hours after the such notice is: (i) deposited in the United States Mail as registered or certified material, postage prepaid, with return receipt requested, addressed as indicated below, or to such other address as either party designates by ten (10) days prior written notice; and (ii) transmitted by electronic mail or facsimile transmittal, provided that such notice is also transmitted by postage prepaid mail, return receipt requested, as provided in **Section 9.7(c)** above. All such notices shall be addressed as follows:

If to the Owner:

WinStar Village, LLC
2020 Lonnie Abbott Boulevard
Ada, Oklahoma 74820-9255
Facsimile:    (580) 559-0635
E-mail:        james.neeley@chickasaw.net

Attn: Pat Neeley, Manager

With a copy to:

McAfee & Taft
Two Leadership Square, 10th Floor
211 North Robinson
Oklahoma City, Oklahoma 73102
Facsimile:    (405) 228-7432
E-mail:        frank.hill@mcafeetaft.com

Attn: Frank D. Hill, Esq.

and with a copy to:

WinStar Development Team, LLC
9211 Lake Hefner Parkway, Suite 110
Oklahoma City, OK 73134
Facsimile:    (405) 270-4666
E-mails:       rhogan1@cox.net
               irish2100@aol.com

Attn: D. Randolph Hogan, Manager

Attn: John Kennedy, Manager

If to the Architect:

RBA Architects
14918 Hertz Quail Springs Parkway
Oklahoma City, Oklahoma 73134
Facsimile:    (405) 843-0523
E-mail:    rbrown@rbaarch.com

Attn:    Richard R. Brown

9.8    Certain Definitions.    Except as inconsistent with or as otherwise specifically defined herein, the terms "Work," "Phase," "Certificate for Payment," "Request for Payment," "Change Order Request," "Change Order" and "Guaranteed Maximum Price," will have the meanings given such terms in the Project Contract, including without limitation the Purchasing Agency Contract, to be entered into between the Owner and the Contractor and/or the Purchasing Agent, as applicable.

9.9    Confidentiality.    Owner and Architect agree that:

9.9.1    The terms and conditions of this Agreement are confidential, proprietary and material to each party's interest, business and affairs. Each party agrees to maintain confidentiality of the terms and conditions hereof, provided that the information contained herein may be used by each party's respective employees, officers and professional advisors only to the extent necessary for the purpose of performing or enforcing this Agreement.

9.9.2    In the course of performing services, the parties recognize that the Architect may come in contact with and become familiar with information that is considered highly confidential. This information may include, but is not limited to, information regarding internal operations, policies, trade secrets, proprietary data, plans, and employees of the Owner or its affiliates. The Architect agrees to keep all such information confidential and not to discuss or divulge it to anyone other than the appropriate personnel or their Designees within the Owner.

9.9.3    The obligation of confidentiality set forth in this Section shall survive the expiration of the term of this Agreement or the earlier termination of this Agreement in full force and effect, and Owner reserves any and all rights to enforce this provision, notwithstanding any termination or other provision of this Agreement.

9.10    Terms Generally.    The terms and phrases used hereunder shall apply equally to both the singular and plural forms of the term or phrase defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed to be references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. The headings of the Articles and Sections

28

are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. Unless the context shall otherwise require, any reference to any Contract Document, other document or legal requirement is to it as amended and supplemented from time to time (and, in the case of any statute, rule, regulation, ordinance or otherwise controlling or applicable authority enacted or adopted by a Governmental Authority having jurisdiction [sometimes herein called a "Law"], to any successor provision thereof). Any reference in this Agreement to a "day" or a number of "days" (without the explicit qualification of "business") shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a business day, then such action or notice shall be deferred until, or may be taken or given on, the next business day. Unless otherwise specifically indicated, the word "or" shall be deemed to be inclusive and not exclusive.

9.11    Severability.  In case any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect for any reason, such invalidity, illegality or unenforceability will not affect any other provisions hereof, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

9.12    Attorneys' Fees.  Should either party employ an attorney to enforce any of the provisions hereof, or to protect such party's interest in any matter arising under this Agreement, or to recover damages for the breach of this Agreement, the losing party in any final judgment agrees to pay to the prevailing party all reasonable costs, charges and expenses, including reasonable attorneys' fees, expended or incurred by the prevailing party in connection therewith.

9.13    Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single Agreement. Any signature delivered by facsimile or other electronic transmission, shall be deemed to be an original signature.

**[SIGNATURE PAGE FOLLOWS]**

This Agreement has been executed as of the Effective Date.

ARCHITECT:

RBA ARCHITECTS
An Oklahoma professional corporation

By: Richard R. Brown,
     President

OWNER:

WINSTAR VILLAGE, LLC
an Oklahoma limited liability company

By: Pat Neeley,
     Manager

30

FINAL

CONSTRUCTION CONTRACT

BETWEEN

WINSTAR VILLAGE, LLC,
an Oklahoma limited liability company

AND

ANDRES CONSTRUCTION SERVICES, LLC
a Texas limited liability company

DATED:  October 30, 2012

PROJECT:  CENTRAL PARK AT WINSTAR VILLAGE

Exhibit
2

TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| SECTION 1: | Construction | | 1 |
| | 1.1 | The Building; Plans and Specifications | 1 |
| | 1.2 | The Work | 2 |
| | 1.3 | Quality of Work | 3 |
| | 1.4 | Performance of Work | 3 |
| | 1.5 | Guaranties and Warranties | 3 |
| | 1.6 | Correcting Defective Work | 4 |
| | 1.7 | Shop Drawings, Samples and Schedules | 4 |
| | 1.8 | General Conditions | 4 |
| SECTION 2: | Permits and Licenses; Conflicts with Plans or Laws | | 5 |
| SECTION 3: | Time for Performance | | 5 |
| | 3.1 | Contract Period | 5 |
| | 3.2 | Substantial Completion | 5 |
| | 3.3 | Date of Final Completion | 6 |
| SECTION 4: | Changes | | 6 |
| SECTION 5: | Payments | | 6 |
| | 5.1 | Contract Sum | 6 |
| | 5.2 | Contractor's Cost; Excluded Costs | 8 |
| | 5.3 | Payment of Contract Sum | 12 |
| | 5.4 | No Waiver or Acceptance | 14 |
| | 5.5 | Use of Funds by Contractor | 14 |
| | 5.6 | Contractor's Records | 14 |
| | 5.7 | Payment of Bills | 14 |
| | 5.8 | Owner Not Required to Make Payments | 15 |
| | 5.9 | Discounts | 15 |
| | 5.10 | Allowances | 15 |
| | 5.11 | Sale of Equipment | 16 |
| SECTION 6: | Insurance | | 16 |
| | 6.1 | Provided by the Contractor | 16 |
| | 6.2 | Notices | 17 |
| SECTION 7: | Indemnity | | 17 |
| | 7.1 | For the Owner | 17 |
| | 7.2 | Indemnity Not Limited | 17 |

i

SECTION 8:  Contractor's Bond and Subcontractor's Surety Bonds            18
      8.1    Contractor's Bond            18
      8.2    Subguard Program            18

SECTION 9:  Independent Contractor            18

SECTION 10:  Inspection            19
      10.1    Inspection of Land            19
      10.2    Access and Safety Facilities            19
      10.3    No Waiver or Acceptance by the Owner            19
      10.4    Inspection of Work; Contractor's Records            19

SECTION 11:  Notices            19

SECTION 12:  Liens            21
      12.1            21
      12.2            21

SECTION 13:  Termination            21
      13.1    Default by Owner            21
      13.2    Default by the Contractor            22
      13.3    Mitigation of Costs            24
      13.4    Survival of Obligations            24

SECTION 14:  Title to Work            25

SECTION 15:  Waiver            25

SECTION 16:  Patents and Royalties            25

SECTION 17:  Protection of Work in Progress            25

SECTION 18:  Compliance with Laws            26
      18.1    Governmental Authority            26
      18.2    Law            26
      18.3    Requirement of Law            26
      18.4    Governing Law            26

SECTION 19:  Personnel            26

SECTION 20:  Force Majeure            27

SECTION 21:  As-Built Drawings            27

SECTION 22:  Place of Work            27

ii

SECTION 23:  Storage Facilities                                    28

SECTION 24:  Removal of Equipment                                  28

SECTION 25:  Entire Agreement                                      28

SECTION 26:  Assignment                                            28

SECTION 27:  Unforeseen Soil Conditions                            29

SECTION 28:  Headings                                              29

SECTION 29:  Terms Generally                                       29

SECTION 30:  Counterparts                                          30

# CONSTRUCTION CONTRACT

THIS CONSTRUCTION CONTRACT (the "**Contract**"), made and entered into as of the 30th day of October, 2012 (the "**Effective Date**"), between **WINSTAR VILLAGE, LLC,** an Oklahoma limited liability company, having an office at 2020 Lonnie Abbott Boulevard, Ada, Oklahoma 74820-9255 (the "**Owner**"), and **ANDRES CONSTRUCTION SERVICES, LLC,** a Texas limited liability company, having an office at 3710 Rawlins, Suite 1510, Dallas, Texas 75219 (the "**Contractor**").

## R E C I T A L S :

A.    The Owner is the owner of certain real property (the "**Land**") which is located in Love County, Oklahoma, and which is more particularly described on ***Exhibit B*** attached hereto.

B.    The Owner desires to have certain development made to, and certain improvements constructed on, the Land, and the Contractor desires to prosecute such development and to construct such improvements, all upon and subject to the following terms, conditions and provisions.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the premises and the mutual covenants, agreements, and undertakings herein contained, and in further consideration of the mutual benefits to accrue to each of the parties hereto, the Owner and the Contractor hereby agree as follows:

### SECTION 1

### Construction

1.1    <u>The Building; Plans and Specifications</u>.  The Contractor shall develop the Land and then shall construct and equip for the Owner on the Land a multi-family residential housing project containing:  (a) approximately two hundred fifty-two (252) multi-story dwelling units (individually, a "**Unit**") consisting of one, two and three bedroom unit designs located within thirteen (13) detached wood frame structure buildings (the "**Buildings**") as are identified on the "**Construction Progress Schedule**" attached as ***Exhibit C*** hereto, whereon the Buildings are placed into various multiple building groupings and related components (each a "**Phase**"), reflecting thereon independent Dates of Substantial Completion (hereafter defined) and Dates of Final Completion (hereafter defined), to be met by the Contractor for sequential delivery to the Owner; plus (b) related clubhouse, common area, pool and recreational, business service center, food and beverage and parking amenities and facilities (sometimes herein collectively called, the

1

5

"**Clubhouse and Common Area Facilities**"); plus (c) certain related managerial, sales, leasing and marketing facilities (the "**Marketing Facilities**"); plus (d) all equipment, apparatuses and Materials (hereafter defined) as shown in the Plans and Specifications or, as well as all necessary for the full completion and equipping of the multifamily residential complex, but which shall include only those certain specific items of furniture, fixtures and equipment (the "FFE") as are specifically shown in the Plans and Specifications, but no FFE is otherwise included; all of which are sometimes also commonly known as "**Central Park at WinStar Village**" and sometimes herein collectively called the "**Project**" (the development of the Land and the construction, installation and equipping of the improvements and facilities thereon are sometimes herein collectively referred to as the "**Improvements**"), with all such construction to be constructed pursuant to and in strict accordance with the "Plans and Specifications" therefor. As used herein, "**Plans and Specifications**" shall mean: (i) those certain detailed schematic plans (sometimes herein separately called, the "**Plans**" or the "**Drawings**") and related specifications (sometimes separately herein called, the "**Specifications**") for the Project which have been prepared by RBA Architects, an Oklahoma professional corporation having an office in Oklahoma City, Oklahoma, the design architect for the Project (the "**Design Architect**"), which are more particularly described on *Exhibit D* attached hereto (the "**Design Documents**") including in each instance the Plans, Drawings, Specifications, Shop Drawings, Schedules, Bulletins, Memoranda, and Samples described in **Sections 1.7** and **1.8** below; and (ii) those certain schematic design plans and specifications prepared by the separate civil engineering service company which will be providing civil engineering services to the Owner (the "**Site Civil Engineer**") for the development of the site to permit construction of the Project, all as are more particularly described on *Exhibit E* attached hereto (the "**Engineering Documents**"); as well as any and all revisions to all of the preceding or additions or supplements thereto, made pursuant to the provisions of the Contract Documents (hereinafter defined). The Owner does not warrant and the Contractor shall not be responsible for the adequacy or sufficiency of the Plans and Specifications or any matter related thereto. The term "**Architect**", when used herein, shall refer to RBA Architects, as the Design Architect, unless the context of the application of such term clearly requires reference to the Site Civil Engineer, or until the Owner gives the Contractor written notice naming another party as the Architect.

     1.2   The Work. The Contractor shall provide and furnish all materials, supplies, apparatuses, appliances, equipment, fixtures, tools, implements and all other facilities (hereinafter collectively referred to as the "**Materials**") and all labor, supervision, transportation, utilities, storage and all other services (collectively hereinafter referred to as the "**Services**") as and when required for or in connection with the development, construction and equipping of, or for inclusion or incorporation into the Land, the Project and the Improvements. Such development, construction and equipping of the Land, the Project and the Improvements and the furnishing of the Materials and Services in accordance with the Contract Documents are hereinafter collectively referred to as the "**Work**" which shall include, for purposes of clarification but not limitation, all Materials and Services required, necessary or appropriate in the Design Documents delivered by the Architect, and the Engineering Documents delivered by the Site Civil Engineer, respectively, and which in each instance shall include all work necessary with respect to: (i) the initial development of the Land, including all infrastructure set forth in the Engineering Documents and the Design Documents therefor; (ii) all mechanical, electrical plumbing, structural, lighting, acoustical, ventilation and air treatment or handling systems

6

(collectively , the "**MEPS Systems**"); (iii) all life safety, security and fire protection systems (collectively the "**Life Safety Systems**"); and (iv) all systems, facilities and designs required for compliance with the Americans with Disabilities Act (the "**ADA Systems**"; the MEPS Systems, the Life Safety Systems and the ADA Systems are sometimes herein collectively called, the "**Project Systems**").

1.3     Quality of Work.  The Contractor covenants and warrants that all of the Work shall be done in a good and workmanlike manner and free of defects, and that all of the Materials furnished and used in connection therewith shall be new and free of defects and of the best and highest quality, except as otherwise expressly provided for in the Plans and Specifications.  The Contractor agrees that if any Materials which are different from those specified in the Plans and Specifications for a particular purpose are incorporated by the Contractor into the Work for such, all of which shall fully delineate and describe the architectural, structural, mechanical, electrical and site development Work, and the scope, Materials and quality of workmanship for all parts of the Project and Improvements, purpose without the written approval of the Owner, then the Contractor shall be deemed to have covenanted and warranted that all such Materials so incorporated by the Contractor into the Work without the written approval of the Owner are adequate for the intended purpose.  The Contractor further covenants that if in the judgment of the Contractor any of the Materials specified in the Plans and Specifications are inadequate for the intended purpose, the Contractor will so notify the Owner prior to their incorporation into the Work, and will recommend to the Owner substitute materials which are adequate for the intended purpose.  The Contractor shall cause all Materials and other parts of the Work to be readily available as and when required or needed for or in connection with the development, construction and equipping of the Improvements.  The Contractor shall inspect carefully all of the Work.  Nothing contained in this subsection shall be construed as authorizing the Contractor to incorporate any materials into the Work which are different from those specified in the Plans and Specifications, unless the Contractor shall have obtained the Owner's approval as provided in **Section 5.5** of the General Conditions.

1.4     Performance of Work.  The Contractor shall provide competent supervision of all phases of the development of the Land and the construction and equipping of the Improvements, and shall cause the Work to be performed in strict and complete accordance with the Plans and Specifications and all things reasonably indicated or implied therefrom, and shall advise the Owner of all defects in the Plans and Specifications that the Contractor discovers; provided however, the Contractor has no duty to discover any such defects.  All Work performed by the Contractor hereunder shall be performed to the complete satisfaction of the Architect and the Site Civil Engineer as long as any requirements of the Architect and the Site Civil Engineer are consistent with the obligations of the Contractor to develop the Land and to construct and equip the Improvements as set forth in this Contract.

1.5     Guaranties and Warranties.  The Contractor hereby assigns unto the Owner, and agrees to further assign to the Owner upon final completion and the Owner's acceptance of any Phase of the Work, all of the Contractor's rights under guaranties and warranties to the Contractor and all subcontractors and suppliers and manufacturers furnishing labor and material in the performance of the Work, all without waiver or limitation of any warranties or guaranties provided or required by this Contract or any of the other Contract Documents.  Except where

3

longer warranties or guaranties are required by other provisions of the Contract Documents, the Contractor hereby warrants and guarantees all work and materials furnished under the Contract Documents against defects in materials and workmanship, or either, that appear within a period of one (1) year from the Date of Substantial Completion (hereinafter defined) of each and every Phase of the Work. All defects in workmanship and materials, or either, appearing or occurring during the period of the applicable warranty or guaranty shall be corrected to the satisfaction of the Architect in accordance with the terms of such warranty or guaranty and in accordance with **Section 1.6** below.

1.6     Correcting Defective Work. The Contractor shall: (i) re-execute any parts of the Work that fail to conform with the requirements of this Contract that appear in the progress of the Work; (ii) remedy any defects in the Work due to faulty materials or workmanship which appear within a period of one (1) year after the Date of Substantial Completion of the Work of any Phase or within such longer period of time as may be set forth in the Plans and Specifications or the other Contract Documents (the Contractor and the Owner agree to mutually execute and deliver written confirmation of the commencement date of such warranty period for each Phase of the Work, within thirty (30) days of the Date of Substantial Completion for each such Phase; and (iii) replace, repair, or restore any part of the Improvements or furniture, fixtures, equipment, or other items of personal property placed therein (whether by the Owner or any third party) that are injured or damaged by any such parts of the Work that do not conform to the requirements of the Contract Documents or by defects in the Work. The provisions of this subsection apply to work done by subcontractors of the Contractor and subcontractors as well as work done by direct employees of the Contractor.

1.7     Shop Drawings, Samples and Schedules. The Contractor shall prepare or cause to be prepared all Shop Drawings and Samples (as such terms are defined in **Section 6.1** of the General Conditions) and schedules related thereto ("**Schedules**") and other detailed drawings not made a part of the Drawings and Specifications prepared by the Site Civil Engineer or the Architect which are required in the performance of the Contractor's obligations hereunder.

1.8     General Conditions. Certain additional and supplementary terms, provisions and general conditions of this Contract are attached hereto as ***Exhibit A*** and made a part hereof for all purposes (the "**General Conditions**"). The term "**Contract Documents**" when used herein shall mean this Contract, the Direct Buy Addendum (hereafter defined and attached hereto), the General Conditions, all of the items enumerated in ***Exhibit D*** and ***Exhibit E*** both of which are attached hereto, the Schedule of Cash Allowances, the final Budget for the Project (hereafter defined) and the Qualifications (hereafter defined) attached hereto as ***Exhibit H,*** and all change orders or addenda issued with respect to any of the preceding. In the event of variance or conflict between a provision in one Contract Document and another, the Contract Document with the higher priority shall control. This Contract has the highest priority, the Direct Buy Addendum has the second highest priority, the General Conditions have the third highest priority, the Design Documents (including all of the Plans and Specifications) have the next highest priority, the Engineering Documents have the next highest priority, the Schedule of Cash Allowances has the next highest priority, the final Budget for the Project attached hereto as ***Exhibit F*** (as also hereafter defined) has the next highest priority, the "**Scope Qualifications; Allowances and Exclusions**" attached hereto as ***Exhibit H*** (the "**Qualifications**") has the next

4

8

highest priority, and then the other Contract Documents are listed in order of priority on ***Exhibit D*** attached hereto, with the Contract Document having the next highest priority being listed first and the Contract Document with the lowest priority being listed last.

SECTION 2

Permits and Licenses; Conflicts with Plans or Laws

The Contractor shall obtain, as a cost to be directly paid by the Owner outside of the Contract Sum and outside of the Guaranteed Maximum Price, all necessary licenses, permits, and similar authorizations from Governmental Authorities required to perform its obligations hereunder, and shall give all notices required by, and otherwise comply with all applicable Laws (hereafter defined), all of which shall include, without limitation, the Contractor obtaining the appropriate certificates of occupancy from the Fire Marshall of the State of Oklahoma for each Phase of the Project, as well as from any other Governmental Authority which might in the future have jurisdiction (each a "**Certificate of Occupancy**") on or before the Date of Substantial Completion of each and every Phase as shown on the Construction Progress Schedule. The Contractor shall notify the Owner of all conflicts between the Plans and Specifications and any Law that comes to the attention of the Contractor. If the Contractor performs any of the Work knowing it to be contrary to such Laws and fails to give the Owner notice thereof prior to performance thereof, the Contractor shall bear all costs arising therefrom (including the cost of correcting such Work and all fines, penalties, attorneys' fees and court costs) and such costs shall not be included in the Contractor's Cost (hereinafter defined) and the Contractor shall indemnify the Owner with respect to all such costs.

SECTION 3

Time for Performance

3.1     Contract Period. The Contractor shall commence performance of the Work within ten (10) calendar days after receipt by the Contractor of a written notice to proceed ("**Notice to Proceed**") from the Owner and thereafter diligently shall proceed with the performance thereof to completion. The Contractor shall use its best efforts to complete the performance of the Work within the period (the "**Contract Period**") which: (i) commences (the "**Commencement Date**") on the **earlier of**: (a) ten (10) days after the receipt by the Contractor of the Notice to Proceed; and (b) the date on which the Contractor commences the Work; and (ii) ends with respect to: (a) each and every Phase, on the dates set forth on the Construction Progress Schedule; and (b) the Project as a whole, ending five hundred and ten (510) days from the Commencement Date; provided however, the date on which the Contract Period shall end shall be extended by: (1) the number of days required to perform the net amount of the Work added by Change Orders (herein defined) in the aggregate, as provided in **Section 4** hereof; and (2) the number of days that completion of the Work is delayed by Force Majeure (herein defined).

3.2     Substantial Completion. The Improvements will be deemed to have been substantially completed (such date of substantial completion being hereinafter called the "**Date of Substantial Completion**") for each Phase of the Project and for the Project as a final and

9

complete project, respectively, on the date on which the Architect and the Site Civil Engineer have certified to the Owner that: (i) all of the Work is essentially completed, except for minor adjustments or minor deficiencies which have no material effect upon the utilization, function or intrinsic value of the Improvements to the point that the Owner is able to furnish to the occupants and tenants of the Improvements all utilities, heating and air conditioning, electric lighting and other services (including all Project Systems services) normally furnished in multi-building, multi-story, multi-family residential apartment complexes, including clubhouse, recreational and parking amenities, all as are similar to the Central Park at WinStar Village; and (ii) an Certificate of Occupancy has been issued for the entire Improvements within each Phase of the Project and for the Project as a whole, respectively, by the appropriate Governmental Authority.

3.3    Date of Final Completion.  The date of final completion of the Work (the "**Date of Final Completion**") for the Project as a final and complete project, shall be the date on which both the Architect and the Site Civil Engineer shall certify to the Owner that all of the Work has been finally completed under the Contract Documents, shall have issued a final Certificate for Payment with respect thereto as required by **Section 12.8** of the General Conditions and the Owner shall have received a final Certificate of Occupancy therefor.

SECTION 4

Changes

The Owner from time to time shall have the right to make changes in the Work, either to decrease, increase, or modify the Work, by giving the Contractor a written change order request ("**Change Order Request**"), setting forth in detail the nature of the change.  Upon receipt of a Change Order Request, the Contractor forthwith shall furnish to the Owner a statement setting forth in detail the Contractor's proposal of the changes, if any, in the Schedule of Values, Contract Period, Guaranteed Maximum Price and Contractor's Costs as such terms are hereinafter defined, attributable to the changes set forth in such Change Order Request.  If the Owner approves in writing such proposal by the Contractor, such Change Order Request and such proposal shall mean a "**Change Order,**" and the Schedule of Values, Contract Period, Guaranteed Maximum Price and the Contractor's Cost shall be adjusted as set forth therein.

SECTION 5

Payments

5.1    Contract Sum.  Consideration for the full and complete performance of the Work, and performance of all of the Contractor's obligations under the Contract Documents, shall be made by the Owner to the Contractor by payment of an amount equal to the sum (collectively, the "**Contract Sum**") of either:  (a) the cumulative payments of funds aggregating the amount determined in accordance with the methodology set forth in **Section 5.1.1** below; or (b) such lesser amount as might be determined in accordance with the methodology set forth in **Section 5.1.2** below.

6

5.1.1    <u>Guaranteed Maximum Price</u>. The Contract Sum will be equal to the **lesser of** the following:

(a)    A Guaranteed Maximum Price (the "**Guaranteed Maximum Price**") of NINETEEN MILLION SEVEN HUNDRED FIFTY THOUSAND AND FORTY-SIX DOLLARS ($19,750,046); or

(b)    The total of:

(i)    An amount equal to the sum of:    (aa) a stipulated fee ("**Contractor's Fee**") equal to SEVEN HUNDRED AND FIFTY-THREE THOUSAND EIGHT HUNDRED SEVENTY-THREE DOLLARS ($753,873); and (bb) as that amount might be increased or decreased by additions or deletions by Change Orders as provided in the Contract Documents whereunder the Contractor's Fee will be increased or decreased by an amount equal to four percent (4%) of the Contractor's Cost of each Change Order; and

(ii)    The Contractor's Cost, as hereinafter defined, and

(iii)    A sum, not to exceed the maximum amount of ONE HUNDRED NINETY-SEVEN THOUSAND FIVE HUNDRED DOLLARS ($197,500), but which is otherwise equal to fifty percent (50%) of the amount by which the Guaranteed Maximum Price is in excess of the total of (x) the Contractor's Cost, (y) the Contractor's Fee in the amount of SEVEN HUNDRED AND FIFTY-THREE THOUSAND EIGHT HUNDRED SEVENTY-THREE DOLLARS ($753,873) and (z) the amount equal to the unspent portion of the Contractor's Contingency in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000) or such amount as set forth in the final construction Budget for the Project approved by the Owner.

5.1.2    <u>Direct Buy Addendum</u>. The Contractor acknowledges that it is the intent of the Owner that significant portions of the Materials be purchased using the Owner's direct purchase methodology described in detail on that certain **Direct Buy Addendum** attached hereto, whereunder the Contractor and its subcontractors will cause the acquisition of, the payment for, and the incorporation into the Work of Materials designated by Owner all in a fashion as described on the Direct Buy Addendum (the "**Direct Buy Method**") so as to realize savings by not paying sales, excise, use and other similar taxes which would otherwise be payable under Governing Law (the "**Sales Tax Savings**"). Accordingly, the Contractor agrees to use the Direct Buy Method in such a fashion so as to in good faith maximize the Sales Tax Savings for the sole benefit of the Owner and further agrees that the Guaranteed Maximum Price will be reduced by all amounts of Sales Tax Savings so realized. The Contractor agrees to execute and deliver Change Orders, from time to time, which reduce or decrease the Guaranteed Maximum Price to reflect the Sales Tax Savings.

5.1.3   The Contract Sum covers and includes all compensation, payment, and remuneration whatsoever which the Owner is obligated to pay to the Contractor in connection with or growing out of the Work and the Contract Documents or the performance by the Contractor of its obligations thereunder with respect thereto, the parties further agree as follows:

(a)   The determination of the Guaranteed Maximum Price by the parties has been based on the Plans and Specifications which are described on ***Exhibit D*** attached hereto, but the amount of the Guaranteed Maximum Price also takes into account the implementation of all details which will be embodied in the final Plans and Specifications, as defined herein, and which will be necessary to construct a complete and functioning multi-building, multi-story, multi-family residential apartment complexes, including clubhouse, recreational and parking amenities and to otherwise fully complete the Work. Therefore, once established in accordance with **Section 5.1**, the Guaranteed Maximum Price will thereafter remain unchanged unless modified by a Change of Order as provided in **Section 4.1**. References to the terms Guaranteed Maximum Price, Schedule of Values, Contract Period and Contract Sum shall include any adjustments thereto pursuant to any of the provisions hereof.

(b)   In addition to the preceding provisions regarding the Guaranteed Maximum Price, the Owner and the Contractor acknowledge that the construction Budget for the Project is attached hereto as ***Exhibit F***, wherein the various line itemizations of the certain initial general overhead components to be included in the Work have been approved by the Owner as set forth therein, all of which are sometimes collectively called the Contractor's general overhead condition components (a "**General Condition Component**") with each of the General Condition Components are shown in budgeted amounts in line item detail identified by those components (a "**Maximum General Condition Component Amount**"); a detailed description of the definition of the "**General Condition Components**" is maintained at the Owner's office and each line item therefore is described more particularly therein. Accordingly, the Owner and the Contractor have further agreed that notwithstanding anything in the preceding provisions of **Section 5.1** or otherwise in the Contract Documents to the contrary, the sum of the Contractor's Cost and the appropriately allocated portion of the Contractor's Fee for each General Condition Component Amount is guaranteed by the Contractor not to exceed the Contractor's Maximum General Condition Component Amount, as determined on a Maximum Component Amount basis, and any excess will be paid by the Contractor without increase to the Contract Sum, the Contractor's Fee or the Guaranteed Maximum Price. **CONFIRM**

5.2   Contractor's Cost; Excluded Costs.   As used herein, Contractor's Cost shall be determined as follows:

5.2.1   "**Contractor's Cost**." The term Contractor's Cost shall mean a sum of money equal to the total of the costs incurred by the Contractor in connection with the performance of all of the Work for the following items:

8

(a)    Wages paid for labor in the direct employ of the Contractor in the performance of the Work either as approved by the Owner in the Maximum General Condition Component Amounts, or under a salary or wage schedule agreed upon by the Owner and the Contractor, and including welfare or other fringe benefits, if any, as may be approved by the Owner.

(b)    Salaries and fringe benefits of the Contractor's supervisory or administrative personnel stationed at the field office for the Work and employees engaged at shops or on the road in expediting inspections, production or transportation of the Material for the Work as approved by the Owner in the Maximum General Condition Component Amounts; provided, however, the number of such personnel and the employees shall not be more or less than the number required to perform the Work in a good and workmanlike and timely manner.

(c)    Costs of contributions, assessments or taxes for such items as Unemployment compensation and social security, insofar as such costs are based on wages, salaries or other remuneration paid to employees of the Contractor and included in the Contractor's Cost under **Subsections 5.2.1(a)** and **5.2.1(b)** above.

(d)    To the extent previously approved by the Owner in writing in the Maximum General Condition Component Amounts, reasonable transportation, traveling and lodging expenses of officers or representatives of the Contractor incurred in the discharge of duties related to the Work.

(e)    Cost of all Materials including costs of transportation thereof.

(f)    Amounts due for the performance of work under all subcontracts made in accordance with the provisions of the Contract Documents, but excluding any damages payable thereunder on account of default or negligence (other than normal job condition errors) of the Contractor.

(g)    The Cost of telephone, telegrams, postage, photographs, blueprints, office supplies, first aid supplies and related miscellaneous costs incurred in connection with the Work, as approved by the Owner in the Maximum General Condition Component Amounts.

(h)    Damages for patent infringements and costs of defending suits on account of same to the extent that such damages or costs shall have arisen out of the specification by the Architect of a particular process or product of a particular manufacturer and the infringement was unknown to the Contractor.

(i)    Permit fees and royalties for use of patents, if any, used in the Work.

(j)    Cost of obtaining and using all utility services required for the Work, encompassing the coordination with all appropriate authorities for obtaining necessary utility services and including coordination with the "Chickasaw Tribal Utility Authority

9

(the "CTUA"). After any occupancy of any portion of the Improvements, arrangements will be made for any occupant to pay the cost of any utilities consumed by it between the date of occupancy and Date of Substantial Completion. After the Date of Substantial Completion, the cost of utilities not required for the further prosecution of the Work shall be paid by the Owner and shall not be included as part of the Contractor's cost. If utility services are needed for the prosecution of the Work after the Date of Substantial Completion, however, the total cost of utility services shall be prorated between the Owner and the Contractor, and with the Contractor paying an amount each month equal to the average monthly cost of utility services during the three (3) month period prior to the Date of Substantial Completion.

(k)    Cost of crossing, protecting or altering any public utility lines or facilities, if required and as directed by the Owner.

(l)    Cost of losses and expenses actually sustained by the Contractor in connection with the Work; provided, however, to the extent that any such cost is reimbursable by insurance or otherwise, or is due to the Contractor's default, including the failure of the Contractor to comply with the requirements of this Contract or any subcontract, or to the failure of the Contractor to exercise due care, such costs shall not be included in the Contractor's cost. Notwithstanding the foregoing provisions of this **Subsection 5.2.1(l)**, the Owner agrees that costs incurred by the Contractor in order to correct normal job condition errors shall be included in the Contractor's Cost.

(m)    Rental charges of all necessary tools, machinery and equipment used at the site of the Work, whether rented from the Contractor or others, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof, at rental charges consistent with the competitive prices prevailing in the area; provided, however, rental of equipment owned by the Contractor shall be first approved by the Owner in writing.

(n)    The amount, if any, of all sales, use or other similar taxes related to the Work imposed by any Governmental Authority for which the Contractor is liable.

(o)    Cost of removal of all debris.

(p)    Costs incurred due to an emergency affecting the safety of persons and property.

(q)    Costs of complying with the Federal Occupational Safety and Health Act with respect to the Work.

(r)    Any and all other expenses or charges incurred with the prior written approval of the Owner in the prosecution of the Work.

(s)     All costs and fees incurred in connection with obtaining building permits, insurance and bonds required to be furnished by the Contractor under the Contract Documents in connection with the Work.

(t)     All costs incurred by the Contractor in correcting all Work rejected by the Architect as defective or as failing to conform to the Contract Documents, except:  (i) amounts spent by the Contractor in performing its obligations pursuant to the last sentence of **Section 2** hereof; and (ii) costs of correcting the Work for which lump sum subcontractors and material suppliers are responsible under the scope of their respective contracts with the Contractor; and (iii) costs for which the Contractor is reimbursed under warranties from manufacturers and subcontractors.

(u)     Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Contractor or paid to any Subcontractor of a Vendor, with the Owner's prior written approval.

(v)     Contractor's Subcontractor Default Program at 1.6% times the cost of each subcontract and/or purchase order.

(w)     Costs of purchasing and maintaining the insurance required under **Section 6** hereunder.

(x)     Those portions of the following costs as approved by the Owner within the Maximum General Condition Component Amounts:  (i) costs for electronic equipment and software, directly related to the Work; (ii) cost accounting services provided for billing and project management purposes; and (iii) network document storage.

5.2.2   Excluded Costs.  The **Contractor's Cost shall not include** the following items:

(a)     Except as previously approved by the Owner in writing or as a part of the Maximum General Condition Component Amounts, the wages or salary of any officer or the Contractor.

(b)     Except as previously approved by the Owner in writing or as a part of the Maximum General Condition Component Amounts, salary or wages of any person employed in the main office, or in any regularly established branch office of the Contractor, except that the salary and fringe benefits of the Contractor's project manager shall be included in the Contractor's Cost, as provided in **Subsection 5.2.1(b)** herein.

(c)     Expenses of the Contractor's principal and branch offices (other than the field office for the Work), and overhead and general expenses of any kind, except those that are expressly included in **Subsection 5.2.1(b)** above or in the Maximum General Condition Component Amounts.

(d)    Any part of the Contractor's capital expenses, including interest on capital employed either in the plant or expenditures on the Work.

(e)    Costs due to the negligence of the Contractor, any subcontractor, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including disposal of materials and equipment wrongly supplied, or making good any damage to property.  Notwithstanding the foregoing provisions of this **Subsection 5.2.2(e)**, the Owner agrees that costs incurred by the Contractor in correcting normal job condition errors shall be included as part of the Contractor's Cost.

(f)    Amounts spent by the Contractor to correct defects in the Work if the Contractor performed such Work knowing that it did not comply with the requirements of the Contract Documents and did not have written approval from the Owner to do so after advising the Owner of the noncompliance prior to performing the Work.

(g)    Amounts spent by the Contractor in performing its obligations pursuant to the last sentence of **Section 2** hereof.

5.3    Payment of Contract Sum.    The Contract Sum shall be paid in the form of advances against the Contract Sum.

5.3.1    Progress Payments.  "**Progress Payments**" will be made in accordance with the following procedures:

(a)    Not later than the fifth (5th) day of each calendar month during the performance of the Work, the Contractor shall submit to the Architect for its approval a request for payment ("**Request for Payment**") for work performed during the immediately preceding calendar month.  Each Request for Payment shall: (i) set forth the cost and expenses incurred or paid by the Contractor during the immediately preceding calendar month to any subcontractor, materialman, employee or laborer for work actually performed and for materials and equipment incorporated in the Work or suitably stored at the site or at some other location previously agreed upon in writing by the Contractor and the Owner and which are coordinated with the progress of the Work; (ii) be followed by copies of invoices, payrolls, equipment rental schedules and such other evidence as the Owner shall reasonably require as to the costs and expenses incurred or paid by the Contractor during the prior months for which payment has been received by the Contractor; (iii) taking into account the Direct Buy Method and the Sales Tax Savings to be realized thereunder, separately itemize charges for any Materials or Services on which any sales taxes will be payable by the purchaser or user thereof from any charges for any skill or labor upon which no sales taxes will be payable; and (iv) show the amount of sales taxes being collected by the Contractor from the Owner for remittance to the Oklahoma Tax Commission and to any local taxing Governmental Authorities.  After approval of each Request for Payment by the Architect and the issuance of a Certificate of Payment by the Architect with respect thereto as described in **Section 12.5** of the General Conditions, the Owner shall endeavor to use its best efforts to make payment to the Contractor no later than thirty (30) days from the date of submission of each complete

12

and accurate Request for Payment by the Contractor, of an amount of money equal to ninety-five percent (95%) of the amount stated by the Architect to be properly due in the Certificate of Payment.

(b)     Before submitting the first Request for Payment, the Contractor shall submit to the Architect a proposed schedule of values for the various portions of the Work, including quantities if required by the Architect, aggregating the total Contract Sum, divided so as to assist the Architect in determining amounts properly due for Work completed by subcontractors, prepared in such form as specified by the Architect as the Architect and the Contractor may agree upon, and supported by such data to substantiate its correctness as Architect may require.  On final approval by the Owner, such shall constitute the "**Schedule of Values**" for all purposed as used in the Contract Documents.

(c)     The Owner shall retain a sum of money equal to five percent (5%) of the amount stated by the Architect to be properly due in each Certificate of Payment.  Any sums so retained shall be dealt with as follows:

(i) any sums so retained with respect to work performed by a subcontractor shall be paid to the Contractor on or before the date which is thirty (30) days after the date on which the Architect shall have accepted such subcontractor's portion of the Work and the Owner shall have received, in form reasonably satisfactory to Owner and Owner's lender, a Conditional Waiver and Release on Final Payment of mechanics' and materialmen's lien claims of any kind arising directly or indirectly out of such subcontractor's portion of the Work, conditioned solely on such subcontractor's receipt payment therefor in the amount set forth in such Conditional Waiver and Release;

(ii) Any sums so retained with respect to work performed directly by the Contractor and/or the portion of the Contractor's Fee applicable thereto which are at any time in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000), which amount will be retained by Owner through the Contract Period, shall be paid to the Contractor on the date which is thirty (30) days after the date on which the Architect shall have accepted all of Contractor's portions of the Work  and the Owner shall have received, in form reasonably satisfactory to Owner and Owner's lender, a Conditional Waiver and Release on Final Payment of mechanics' and materialmen's lien claims of any kind arising directly or indirectly out of the Contractor's portion of the Work, conditioned solely on such Contractor's receipt payment therefor in the amount set forth in such Conditional Waiver and Release.

(d)     With respect to the ONE HUNDRED THOUSAND DOLLARS ($100,000) "Retainage Amount" or any other amounts owing to the Contractor on completion of the Work, then on or before the thirty-first (31st) day immediately following the Date of Final Completion of all portions of the Work and on acceptance thereof by the Owner and the receipt of the Conditional Waiver and Release on Final Payment, in form reasonably satisfactory to Owner and Owner's lender,  of all mechanics' and materialmen's lien claims of any kind arising directly or indirectly out of

13

the performance of the Work, conditioned solely on such Contractor's receipt payment therefor in the amount set forth in such Conditional Waiver and Release and on delivery of the final Certificate for Payment to the Owner as provided in Section 12.8 of the General Conditions, then upon the occurrence of such events, either: (i) the Owner shall pay to the Contractor the amount, if any, by which the Guaranteed Maximum Price exceeds the total amount of money theretofore paid to the Contractor by the Owner pursuant to the terms of this Contract; or (ii) the Contractor shall pay to the Owner the amount, if any, by which the total amount of money theretofore paid to the Contractor by the Owner pursuant to the terms of this Contract exceeds the Guaranteed Maximum Price.

5.4    No Waiver or Acceptance.  No payment made hereunder shall be or construed to be final acceptance or approval of that part of the Work to which such payment relates or relieve the Contractor of any of its obligations hereunder with respect thereto, or constitute a waiver or otherwise affect the covenants and warranties of the Contractor.

5.5    Use of Funds by Contractor.  The Contractor shall use all progress payments (other than amounts attributable to the Contractor's Fee) made to it pursuant to the provisions hereof solely for the purpose of performance of the Work and the Development, construction and equipping of the Improvements and the Project in accordance with the Plans and Specifications. Upon request from the Owner, the Contractor shall furnish to the Owner satisfactory proof as to the disposition of any funds advanced to the Contractor hereunder; provided, however, no provision hereof shall be construed to require the Owner to see to the proper disposition or application of the funds so advanced.

5.6    Contractor's Records.  The Contractor shall keep accurate records of all persons employed by the Contractor, Materials purchased, and Work subcontracted to other parties, which records shall be open to inspection by the Owner, at reasonable times during ordinary business hours and may be copied by the Owner.  Accounting records pertaining to the Project shall be prepared and maintained on a generally accepted accounting basis or such accounting methods approved by the Owner.

5.7    Payment of Bills.  The Contractor shall promptly pay all bills for labor and materials performed and furnished by others in connection with the development, construction and equipping of the Improvements, the Project and the performance of the Work, and, at the request of the Owner, shall deliver to the Owner copies of paid invoices, receipts, affidavits, and other evidence of payment for all Requests for Payment submitted prior to the current calendar month and obtain and furnish to the Owner appropriate releases and satisfactions from all subcontractors, materialmen and other parties furnishing labor and materials or either in connection with the performance of the Work for: (a) all prior Requests for Payment other than for the Request for Payment being processed for the current calendar month; and (b) with respect to the current calendar month, Owner agrees that such releases, paid invoices and satisfactions, if requested by the Owner, can be placed in escrow conditioned upon delivery of the appropriate payment by Owner therefor; provided, however, if the Contractor determines that any such bills should not be paid, the Contractor shall notify the Owner who shall have the right to require the

Contractor to: (i) pay such bills; or (ii) deliver to the Owner a payment bond, in form and substance satisfactory to the Owner, covering such bills.

5.8     Owner Not Required to Make Payments.  Any provision hereof to the contrary notwithstanding, the Owner shall not be obligated to make any payment to the Contractor hereunder if any one or more of the following conditions exists:

(a)     The Contractor is under a continuing Act of Default under the Contract Documents, beyond any applicable notice and opportunity to cure period;

(b)     Any part of such payment is attributable to Work which is defective or which has not been performed in accordance with the Plans and Specifications or with applicable laws; provided, however, that the Owner shall pay any portion of a payment that is attributable to Work that is not defective or which has been performed in accordance with the Plans and Specifications; or

(c)     The Owner and the Architect shall reasonably determine that the portion of the Contract Sum then remaining unpaid will not be sufficient to complete the Work in accordance with the Plans and Specifications, in which event no additional payments will be due to the Contractor hereunder unless and until the Contractor performs a sufficient portion of the Work so that such portion of the Guaranteed Maximum Price then remaining unpaid is determined by the Owner to be sufficient to so complete the Work.

(d)     The Architect shall decline to approve a Request for Payment and withholds its Certificate of Payment pursuant to the applicable provision of the General Conditions.

5.9     Discounts.  Provided the Owner deposits the requisite amount of cash with the Contractor, the Contractor shall take all cash discounts available to it, and in the event any discount is taken, then: (a) the Contractor's Cost of the materials on which a discount is taken shall be deemed to be the discounted "net" price of such Materials rather than the "gross" price thereof, except that for the purposes of **Sections 5.1.1(b)(iii) and 5.1.2** hereof the Contractor's Cost shall be deemed to include the full "gross" price of such Materials, and (ii) the Guaranteed Maximum Price shall be reduced by an amount equal to the difference between the gross price and the net price of such Materials.  If the Contractor takes a discount on Materials, but the cash for such discount is not deposited by the Owner with the Contractor to enable the Contractor to take the discount, then the Contractor's Cost for such materials shall be deemed to be the gross price therefor.  All trade discounts, rebates and refunds and all returns from the sale of surplus property and equipment shall be applied to and reduce the Contractor's Cost, and the Contractor shall make provision so that they can be secured.

5.10     Allowances.  As referenced in and in accordance with **Section 5.11** of the General Conditions, certain cash allowances, which are enumerated on ***Exhibit G*** attached hereto and made a part hereof for all purposes, have been agreed upon by the Owner and the Contractor for certain portions of the Work, and they include all costs for Materials and Services which the parties estimate will be incurred by the Contractor in performing the portions of the Work for which allowances are specified.  If the actual Contractor's Cost incurred in performing any such

15

portion of the Work exceeds the amount of the allowance specified for such portion of the Work on said ***Exhibit G***, then the Guaranteed Maximum Price shall be increased by an amount equal to such excess cost. On the other hand, if the actual Contractor's Cost incurred in performing any such portion of such Work is less than the allowance for such portion of the Work specified on said ***Exhibit G***, then the Guaranteed Maximum Price shall be reduced by an amount equal to the difference between the allowance specified for such portion of the Work and the actual Contractor's Cost incurred in performing such portion of the Work.

5.11    Sale of Equipment. Upon completion of the Work or the appropriate parts thereof or if the Contractor terminates its duty to complete the Work as provided in **Section 13.2** hereof, or if the Owner terminates the Contractor's right to complete the Work as provided in **Section 13.4** hereof, then and in any such event the Contractor shall sell to a third party or transfer to itself at the then fair market value thereof, all hoists, scaffolding, forms, hand tools, equipment, Materials and other items purchased for use in the Work with funds furnished therefor by the Owner as part of the Contract Sum. The amounts received from such sale (or the fair market value thereof in the case of transfer to the Contractor) shall be credited against and reduce Contractor's Cost.

SECTION 6

Insurance

6.1    Provided by the Contractor. Without limitation of any of the other provisions of the Contract Documents, the Contractor shall purchase and maintain in force the following insurance in form and from carriers acceptable to the Owner and with not less than the minimum limits set forth below:

(a)    The Contractor's Comprehensive General Liability Insurance with the following minimum limits for this Project (exclusive of any other project):

(i)    Bodily Injury (including death and personal injury): One Million Dollars ($1,000,000) per each occurrence and Two Million Dollars ($2,000,000) in the aggregate, comprised of single limit or policies providing the same total coverage;

(ii)    Property damage liability: One Million Dollars ($1,000,000) per each occurrence and Two Million Dollars ($2,000,000) in the aggregate, comprised of single each occurrence;

(iii)    Umbrella liability coverage: in excess of the limits in (a) and (b) of Five Million Dollars ($5,000,000).

(b)    Worker's Compensation Insurance in accordance with the laws of the State of Oklahoma.

(c)    Builder's Risk Insurance, all risk, completed value form, providing fire, casualty and extended coverage against vandalism and malicious mischief, in an amount not less than the Contract Sum.

16

(d)    Contractual Liability Insurance to cover the Contractor's obligations of indemnity under **Section 7** hereunder with limits of not less than One Million Dollars ($1,000,000).

The Owner and the Owner's lenders shall be named as additional insureds under each of the above policies (except for Worker's Compensation), as Owner may require, each as its interest may appear and all policies shall include such terms and conditions as Owner might require, and in all events will include waivers of subrogation, as well as primary and non-contributory coverage provisions. Before commencing Work under this Contract, the Contractor shall furnish to the Owner, the Architect, the Site Civil Engineer and the Owner's lenders with certificates of the insurers in form and substance satisfactory to the Owner to the effect that such insurance is in force. The cost of purchasing and maintaining such insurance in force shall be included as part of the Contractor's Cost.

6.2    Notices. Each policy of insurance required to be purchased and maintained by the Contractor and each certificate of insurance provided to be furnished by it shall provide that the insurance provided or evidenced thereby shall not be materially changed or cancelled except upon fifteen (15) days prior written notice to the Owner, the Architect, the Site Civil Engineer and to said lenders.

SECTION 7

Indemnity

7.1    For the Owner. The Contractor agrees to protect, indemnify, defend (with counsel reasonably acceptable to and with approval not unreasonably withheld by the Owner) and hold the Owner and the Owner's managers, members, officers, directors, shareholders, partners, principals, agents, representatives, employees, licensees and invitees (collectively the "**Representatives**") and the Representatives of those Representatives (collectively, the "**Indemnitees**"), free and harmless from and against any and all claims, liens, demands, and causes of action of every kind and character including the amounts of judgments, penalties, interest, court costs and legal fees incurred by the Indemnitees from or in defense of same, arising in favor of Governmental Authorities or third parties (including employees of the Contractor or any subcontractor) on account of:
1) taxes, claims, liens, debts; or
2) personal injuries, death, or damage to tangible property
occurring or in anywise incident to, in connection with or arising out of either the failure to perform or the performance of the Work to be performed by the Contractor under the Contract Documents, except insofar as responsibility may be expressly assumed by the Owner under the provisions of the Contract Documents or from such claims arising out of the sole negligence of the Owner.

7.2    Indemnity Not Limited. Maintenance of the insurance referred to in **Section 6** hereof shall not affect the Contractor's obligations hereunder and the limits of such insurance shall not constitute a limit on the Contractor's liability under this **Section 7**. In any and all claims against the Owner or the Architect or any of their respective agents or employees by any

employee of the Contractor or subcontractor, or anyone directly or indirectly employed by any of them or by any one for whose acts any of them may be liable, the indemnification obligation of the Contractor under this **Section 7** shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Contractor or any subcontractor under worker's compensation acts, disability benefits acts or other employee benefit acts.

## SECTION 8

### Contractor's Bond and Subcontractor's Surety Bonds

8.1     <u>Contractor's Bond</u>.  The Contractor, as "Principal", will provide a payment and performance bond covering the Contractor and all of the Work to be performed under the Contract, with such bond to be in form and substance satisfactory to Owner, and to be in an amount not less than the Guaranteed Maximum Price.  Such bond shall be acquired from The Hartford Fire Insurance Company or another surety approved by the Owner, shall be a dual-obligee bond naming both the Owner (WinStar Village, LLC, an Oklahoma limited liability company) and the Owner's lender (Kirkpatrick Bank, an Oklahoma banking corporation) as named obligees thereunder and all costs of such bond shall be a cost directly paid by the Owner outside of the Contract Sum and outside of the Guaranteed Maximum Price.  All refunds from any premiums or dividends received in connection with such bonds, if any in the State of Oklahoma, shall be returned directly to the Owner.

8.2     <u>Subguard Program</u>.  Additionally, the Contractor will, as part of the Contractor's Cost, provide an insurance policy in the event of any default by the subcontractors and material suppliers which will be issued under the Subguard coverage program, issued by Zurich North American Insurance Company ("**Zurich**"), to be in form and substance satisfactory to the Owner, and to be in an amount not less than the full amount of each subcontract, subject to audit and any additive or deductive changes to the subcontract/supplier values in each final subcontract.  The Contractor shall furnish to the Owner a financial interest endorsement from the insurance company naming the Owner and the Owner's lender as co-payees of all claims paid under the Subguard policy.  All premiums for such coverage shall be included in the Contractor's Cost. Such coverage shall be written by Zurich or another insurance company satisfactory to the Owner.

## SECTION 9

### Independent Contractor

In performing its obligations hereunder, the Contractor shall be deemed an independent contractor and not an agent or employee of the Owner.  The Contractor shall have exclusive authority to manage, direct, and control the Work.  The Owner is interested in only the results obtained and not in the methods used in achieving the results.

18

SECTION 10

Inspection

10.1    Inspection of Land.  The Contractor represents that it has inspected the Land and the location or locations of the Work and has satisfied itself as to the observable reasonably foreseeable condition thereof and that the Contract Sum is just and reasonable compensation for all of the Work, including all risks, hazards, and difficulties in connection therewith.

10.2    Access and Safety Facilities.  The Owner or its designated representatives at all times shall have access to the Work for inspection thereof.  The Contractor shall provide proper and safe facilities for such access and inspection.  If any of the Work is required to be inspected or approved by any public authority, the Contractor shall cause such inspection or approval to be performed.

10.3    No Waiver or Acceptance by the Owner.  No inspection performed or failed to be performed by the Owner hereunder shall be a waiver of any of the Contractor's obligations hereunder or be construed as an approval or acceptance of the Work or any part thereof.

10.4    Inspection of the Work; Contractor's Records.  The Contractor shall inspect all materials and labor entering into the Work and shall keep such full and detailed accounts as may be necessary to determine the Contractor's Cost.  The Owner shall have access to the Work and the right to audit all of the Contractor's books, records, correspondence, instructions, drawings, receipts, vouchers, and memoranda relating to the Work, and the Contractor shall preserve all such records for a period of two (2) years after the final payment hereunder.

SECTION 11

Notices

All notices and responses required or permitted to be given hereunder will be deemed to be given and received on the **earlier of**:  (a) when actually received by the Contractor or the Owner, as the case might be; (b) the next business day following the deposit of such notice with a nationally recognized overnight courier for next day delivery, with delivery confirmation received; or (c) seventy-two (72) hours after the such notice is:  (i) deposited in the United States Mail as registered or certified material, postage prepaid, with return receipt requested, addressed as indicated below, or to such other address as either party designates by ten (10) days prior written notice; and (ii) transmitted by electronic mail or facsimile transmittal, provided that such notice is also transmitted by postage prepaid mail, return receipt requested, as provided in (c)(i) above.  All such notices shall be addressed as follows:

19

If to the Owner:

    WinStar Village, LLC
    2020 Lonnie Abbott Boulevard
    Ada, Oklahoma 74820-9255
    Facsimile:    (580) 559-0635
    E-mail:    _____

    Attn:  Pat Neeley, Manager

With a copy to:

    McAfee & Taft
    Two Leadership Square, 10th Floor
    211 North Robinson
    Oklahoma City, Oklahoma 73102
    Facsimile:    (405) 228-7432
    E-mail:    frank.hill@mcafeetaft.com

    Attn:  Frank D. Hill, Esq.

and with a copy to:

    WinStar Development Team, LLC
    9211 Lake Hefner Parkway, Suite 110
    Oklahoma City, OK 73134
    Facsimile:    (405) 270-4666
    E-mails:    rhogan1@cox.net
        irish2100@aol.com

    Attn:   D. Randolph Hogan, Manager

    Attn:   John Kennedy, Manager

If to the Contractor:

    ANDRES CONSTRUCTION SERVICES, LLC
    3710 Rawlins, Suite 1510
    Dallas, Texas 75219
    Facsimile:    (214) 521-4620
    E-mail:    warren@andresconstruction.com

    Attn:   Warren Andres, Project Manager

24

SECTION 12

Liens

12.1    So long as the Owner is not under a continuing Act of Default under the Contract Documents beyond any applicable notice and opportunity to cure period, the Contractor shall not voluntarily permit any laborers', materialmen's, mechanics', or other similar liens to be filed or otherwise imposed on any part of the Work or the property on which the Work is performed.  If any such laborers' materialmen's, mechanics', or other similar lien or claim thereof is filed, then, the Contractor shall, as the Owner in its sole discretion may require, either:  (i) cause such lien to be released and discharged forthwith; or (ii) forthwith deliver to the Owner a payment bond, in form and substance satisfactory to the Owner, covering the claim.  If the Contractor fails to cause such lien to be released and discharged forthwith or fails to deliver such bond to the Owner forthwith, whichever the Owner, may require, then the Owner shall have the right to pay all sums necessary to obtain such release and discharge and deduct all amounts so paid from the Contract Sum.  The Contractor shall indemnify and hold harmless the Owner from all claims, losses, demands, causes of action or suits of whatever nature arising out of any lien which by the terms hereof the Contractor is not to permit to be filed or is required to release.

12.2    The Contractor hereby expressly subordinates all of its constitutional, statutory, and contractual mechanics' and materialmen's liens with respect to the Land and Improvements to the liens which will be created thereon by the Owner in favor of the Owner's lenders providing financing for the Project.  The Contractor further agrees, upon request of said lenders, to deliver a subordination agreement in form and content reasonably acceptable to such lenders and to the Contractor, further evidencing the agreement of the Contractor to subordinate as aforesaid.

SECTION 13

Termination

13.1    <u>Default by Owner</u>.  In the event of an Act of Default by the Owner (hereafter defined), the following shall apply:

13.1.1    <u>Owner's Acts of Default</u>.  Each of the following shall be deemed an "**Act of Default**" by the Owner and a material breach of this Contract:

(a)    If the Work is stopped for a period of ninety (90) consecutive days by an order of any court of other public authority having jurisdiction or as a result of an act of government such as a declaration of national emergency through no act or fault of the Contractor or a subcontractor or their agents or employees or other persons performing any of the Work under a contract with the Contractor;

(b)    If the Work is stopped for a period of thirty-five (35) consecutive days by the Contractor for the Architect's unwarranted failure to approve a Request for Payment

21

as provided in **Section 5.3.1** hereof, or for the Owner's unwarranted failure to make payment thereof as provided in **Section 5.3.1** hereof;

(c)    The Owner unreasonably delays the Contractor in the prosecution of the Work or commits any other substantial breach of this Contract;

(d)    If the Owner shall file a voluntary petition in bankruptcy or shall be adjudicated as bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief for itself under the present or any future Federal Bankruptcy Act or any other present or future applicable federal, state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of the Owner or of all or any substantial part of its properties (the term "acquiesce" includes but is not limited to, the failure to file a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment with thirty (30) days after the appointment).

13.1.2 <u>Contractor's Remedy; Payment to the Contractor</u>.  If any Act of Default by the Owner shall occur, the Contractor shall have the right to deliver written notice thereof to the Owner.  If such Act of Default is not cured within ten (10) days after delivery of such written notice, the Contractor shall have the right to deliver a written notice at any time prior to the curing of such Act of Default which terminates the Contractor's duty to complete the Work, and upon any such termination, the Owner shall pay to the Contractor an amount equal to:

(a)    the amount, if any, remaining unpaid hereunder for the Contractor's Cost incurred as of the date of termination by the Contractor; and

(b)    an allocable amount of the total Contractor's Fee as of the date of termination by the Contractor, less the total of all portions of the Contractor's Fee theretofore paid by the Owner to the Contractor provided, however, that the total of the amounts payable to the Contractor under this **Section 13.1.2** and the amounts theretofore paid to the Contractor under this Contract shall not exceed the Guaranteed Maximum Price.

Upon any such termination by the Contractor, the Contractor shall have the right but, not the obligation, to cause the Owner to assume the obligations of the Contractor under all of its subcontracts and purchase orders covering the unperformed parts of the Work and to indemnify the Contractor from all liabilities arising thereunder (except for liability for the performance or negligence of the Contractor to the date of termination), in which case the Contractor shall assign its contractual rights under such subcontracts and purchase orders to the Owner.

13.2    <u>Default by the Contractor</u>.  In the event of an "Act of Default" by the Contractor (hereafter defined) the following shall apply:

13.2.1 <u>Contractor's Acts of Default</u>. Each of the following shall be deemed an "**Act of Default**" by the Contractor and a material breach of this Contract:

(a)     The Contractor is adjudged as bankrupt or makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of its insolvency;

(b)     The Contractor persistently or repeatedly refuses or fails to supply enough properly skilled workmen or proper materials;

(c)     The Contractor fails to make payment to the subcontractors in accordance with any subcontract between them or for materials or labor;

(d)     The Contractor persistently disregards laws, regulations or orders of any Governmental Authority having jurisdiction;

(e)     The Contractor otherwise materially defaults in its obligations under any provision of this Contract, the Contract Documents or the Contractor fails to complete the Work during the Contract Period;

(f)     If the Contractor shall file a voluntary petition in bankruptcy or shall be adjudicated as bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief for itself under the present or any future Federal Bankruptcy Act or any other present or future applicable federal, state or other state or law relative to bankruptcy, insolvency or other relief for debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of the Contractor or of all or any substantial part of its properties (the term "acquiesce" includes but is not limited to, the failure to file a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment within thirty (30) days after the appointment).

13.2.2 <u>Owner's Remedies; Payments to the Contractor</u>. If any Act of default by the Contractor shall occur, the Owner shall, in addition to all other rights and remedies to which the Owner may be entitled at law or in equity, have the right to deliver written notice thereof to the Contractor. If such Act of Default is not cured within ten (10) days after delivery of such written notice, or, if the Act of Default cannot be corrected within ten (10) days but the Contractor has commenced and is diligently pursuing the correction thereof to completion and in all events such cure can be and has been completed within thirty (30) days after the occurrence of such event of default, then the Owner shall have the right to deliver a written notice to the Contractor at any time prior to such curing of such act of default which terminates the Contractor's right to complete the Work.

Upon any such termination by the Owner, the Owner may in its discretion elect to complete or cause the Work to be completed by whatever method the Owner may deem expedient. In the event the Owner does not elect to complete or cause the Work to be completed, then the Contractor shall not be entitled to any further payment under this Contract or the Contract Documents, including any payment which may have been due to

the Contractor on the date of termination by the Owner. However, if the Owner does elect to complete or cause the Work to be completed, the Owner shall pay to the Contractor on the Date of Final Completion of the Work an amount equal to the sum of the following:

(a)     the amount, if any, remaining unpaid hereunder for the amount of the Contractor's Cost which has accrued on the date of termination by the Owner; and

(b)     an allocable amount of the total Contractor's Fee as of the date of termination by the Owner, less the total of all portions of the Contractor's Fee theretofore paid by the Owner to the Contractor provided, however, that the total of the amounts payable to the Contractor under this **Section 13.2.2** and the amounts therefore paid to the Contractor under this Contract shall not exceed the Guaranteed Maximum Price. Additionally, if the total of: (aa) all payments made to the Contractor under this Contract; and (bb) the cost to the Owner of completing all of the uncompleted Work; is in excess of the Guaranteed Maximum Price, then the Contractor shall pay to the Owner the amount of such excess upon completion of the Work.

In case of any such termination, the Owner, at its election, shall have the right to assume the obligations of the Contractor under all of its subcontracts and purchase orders covering the unperformed parts of the Work and indemnify the Contractor from all liabilities (except liabilities for the performance of negligence of the Contractor to the date of termination) arising thereunder, in which case the Contractor shall execute and deliver all such papers and take all such steps, including the legal assignment of its contractual rights as the Owner may require for the purpose of fully vesting in it the rights and benefits of the Contractor under such obligations and commitments.

13.3     Mitigation of Costs.  Upon any termination of this Contract, the Contractor immediately shall terminate performance of the Work and make every reasonable effort to mitigate its costs hereunder; provided, however, in connection with such termination the Contractor shall perform such acts as may be necessary to preserve and protect that part of the Work theretofore performed hereunder.

13.4     Survival of Obligations.  If the Contractor terminates its duty to complete the Work as provided in **Section 13.1.2** hereof, or if the Owner terminates the Contractor's right to complete the Work as provided in **Section 13.2.2** hereof, the Contractor's liability to the Owner hereunder on account of any breach by the Contractor with respect to any portion of the Work that has been performed at the time of any such termination and the Contractor's obligations under **Section 7** hereof with respect to any portion of the Work that has been performed as of the date of any such termination shall not be affected thereby and shall continue in full force and effect; provided, however, unless payment by the Owner is otherwise excused by a default of the Contractor hereunder, if the Owner does not make payment of amounts properly owing for such portions of the Work, then no warranty will be applicable for any such unpaid Work.  The Contractor shall not be liable, however, with respect to any portion of the Work which is not performed by the date of any such termination, except as may be otherwise expressly provided herein.

## SECTION 14

### Title to Work

Immediately upon the performance of any part of the Work, as between the Contractor and the Owner, title thereto shall vest in the Owner; provided, however, the vesting of such title shall not impose any obligations on the Owner or relieve the Contractor of any of its obligations hereunder.

## SECTION 15

### Waiver

No consent or waiver, express or implied, by either party to this Contract or of any breach or default by the other in the performance of any obligation hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default by such party hereunder. Failure on the part of any party hereto to complain of any act or failure to act of the other party or to declare the other party in default hereunder, irrespective of how long such failure continues, shall not constitute a waiver of the rights of such party hereunder. Inspection by or tentative approval or acceptance by the Owner or the Design Professionals or the failure of the Owner or the Design Professionals to perform any inspection hereunder, shall not constitute a final acceptance of the Work or any part thereof and shall not release the Contractor of any of its obligations hereunder.

## SECTION 16

### Patents and Royalties

The term "**Contractor's Processes**" shall mean all inventions, methods, ideas, equipment, processes, and materials of every kind to be furnished by the Contractor in performance of the Work other than the inventions, methods, ideas, equipment, processes, and materials specified by the Plans and Specifications. The Contractor represents and warrants that it has the right to use all of the Contractor's Processes, and agrees to pay all royalties and other fees required to be paid in connection therewith and agrees to indemnify and hold harmless the Owner from all losses, costs, damages, and expenses of whatsoever nature in connection therewith.

## SECTION 17

### Protection of Work in Progress

The Contractor shall protect and prevent damage to all unfinished phases of the Work, including but not limited to the protection thereof from damage by the elements, theft, or vandalism.

29

SECTION 18

Compliance with Laws

Any provision hereof to the contrary notwithstanding, the Contractor shall observe and abide by and perform all of its obligations hereunder in accordance with all applicable Laws of every Governmental Authority having jurisdiction and will comply with each and every Requirement of Law applicable to the Project, the Work and to the Contractor and its Representatives. As used in this Contract, the following terms will have the following meanings:

18.1    "**Governmental Authority**" shall mean the government of any sovereign nation or any political subdivision thereof having applicable jurisdiction, whether state, local, territory, province or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

18.2    "**Law**" shall mean:  (a) any statute, ordinance, rule, regulation, restriction, judicial ruling of a common or civil law nature, judgment, order, decree, writ, injunction, requirement, or treaty from or involving any Governmental Authority having jurisdiction, including all Environmental Laws (as defined in the General Conditions); and (b) the making or issuance by any Governmental Authority of any request, rule, guideline or directive.

18.3    "**Requirement of Law**" shall mean, as to any entity, the certificate of incorporation and by-laws or other organizational or governing documents of such entity, and any Law, in each case applicable to or binding upon such entity or any of its property, or to which such entity or related property is subject.

18.4    "**Governing Law**" shall mean, as more particularly described in **Section 16.5** of the General Conditions, the fact that:  (a) substantive laws of the State of Oklahoma, without giving reference or giving effect to any choice of law doctrine, will govern the validity, construction and enforcement of the Contract Documents; and (b) any suit, action or proceeding arising out of or relating thereto, shall be brought in a state or a federal court of general jurisdiction sitting in Oklahoma County, Oklahoma.

SECTION 19

Personnel

All personnel used by the Contractor in the performance of the Work shall be qualified by training and experience to perform their assigned tasks.  At the request of the Owner, the Contractor shall not use in the performance of the Work any personnel deemed by the Owner to be incompetent, careless, unqualified to perform the work assigned to him, or otherwise unsatisfactory to the Owner.

SECTION 20

Force Majeure

The term "**Force Majeure**" shall mean strikes, embargos, unusual delays in transportation, national emergencies, Acts of God and similar acts beyond the Owner's or the Contractor's control and delays caused by the Architect's failure to prepare and furnish to the Contractor in a timely manner the Plans and Specifications. Subject to the requirements and provisions of **Section 11.2** of the General Conditions, if either party hereto is rendered unable, wholly or in part, by Force Majeure to carry out its obligations under this Contract, other than its obligations to make payments of money hereunder, then on such party's giving notice and full particulars of such Force Majeure to the other party within ten (10) days after the occurrence of the cause relied upon, then the obligations of the party giving such notice, so far as affected by such Force Majeure, shall be suspended for the periods set forth in, and accordance with the requirements of, the aforesaid **Section 11.2** of the General Conditions.

SECTION 21

As-Built Drawings

The Contractor shall, during the progress of the Work, keep an accurate record of all substantial changes and corrections of the Plans and Specifications, including, but not limited to, all mechanical and electrical layouts, and prior to final payment, the Contractor shall submit to the Owner Plans and Specifications showing any changes in mechanical and electrical layouts. Said "**As-Built Drawings**" shall show accurately all deviations from the Contract Documents and the location of underground utilities and appurtenances, all referenced to permanent surface improvements.

SECTION 22

Place of Work

The Contractor shall, under regulations prescribed by the Owner, use only established roadways, and such temporary roadways as may be authorized by the Owner, unless circumstances reasonably require otherwise. When it is necessary to cross curbing or sidewalks, protection against damage shall be provided by the Contractor, and any damage caused will be, as soon as reasonably possible, repaired by the Contractor when such use is terminated. All existing sidewalks, curbs and pavements which are disturbed, broken, removed or otherwise damaged by the Contractor by or during the performance of the Work shall be replaced by the Contractor and shall be part of the Contractor's Cost. Replaced sidewalks, curbs and pavements shall be smooth, shall blend into the existing work and shall not present depressions or humps, and shall be constructed of similar materials and by methods utilized in the original construction. All construction work, materials, forms, etc., used in repairs and replacement shall conform to the Plans and Specifications that govern the original work.

27

SECTION 23

Storage Facilities

The Contractor may store materials on the job site but only within such land areas approved by the Owner, and the Owner agrees to furnish ample and sufficient storage space therefor. Any temporary buildings shall be removed by the Contractor when no longer needed, or when ordered to do so by the Owner as circumstances reasonably permit, and all storage areas shall be kept clean of unreasonable accumulations of debris and rubbish by the Contractor. Any damage to the ground where sheds were constructed shall be repaired by the Contractor.

SECTION 24

Removal of Equipment

In the case of termination of the Contractor's duty to complete the Work before completion according to the provisions hereof, the Contractor, if notified to do so by the Owner, shall remove any part or all of its equipment and supplies from the property of the Owner within fifteen (15) days from the date thereof, failing which the Owner shall have the right to remove and/or store such equipment and supplies at the expense of the Contractor and to deduct the cost of doing so from the Contract Sum.

SECTION 25

Entire Agreement

This Contract and the General Conditions and exhibits hereto constitute the entire agreement between the parties hereto with respect to the matters covered hereby. All prior negotiations, representations, and agreements with respect hereto not incorporated herein are hereby cancelled. This Contract can be modified or amended only by a document duly executed by a duly authorized manager of the Contractor and by the manager of the Owner.

SECTION 26

Assignment

Except with the express written consent of the Owner, the Contractor shall not assign or otherwise transfer any of its obligations hereunder or right to receive payments hereunder. Subject to the foregoing, this Contract shall inure to the benefit of and be binding on the parties hereto and their respective successors and permitted assigns.

SECTION 27

Unforeseen Soil Conditions

If the subsoil conditions encountered by the Contractor in performing the Work are materially different than the conditions indicated by the soil analyses and soil test borings heretofore delivered to the Contractor by the Owner, then the parties shall agree on a Change Order that fairly compensates the Contractor for the additional work performed by the Contractor to enable the Contractor to perform the work under the actual subsoil conditions.

SECTION 28

Headings

The section headings in this Contract, the Composite Addendum and in the General Conditions are included for convenience of reference only and shall not govern or control the meaning of any provision hereof or of the General Provisions.

SECTION 29

Terms Generally

The terms and phrases used herein and in all of the Contract Documents shall apply equally to both the singular and plural forms of the term or phrase defined. Capitalized terms not defined in this Contract but defined in the Direct Buy Addendum or in the General Conditions, shall have the meanings set forth therein. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references to subcontractors shall include all direct and indirect sub-subcontractors thereof, as well as all subordinate parties thereto furnishing labor or materials in performance of the Work. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed to be references to Articles and Sections of, and Addenda, Exhibits and Schedules to, this Contract unless the context shall otherwise require. The headings of the Articles and Sections are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Contract. Unless the context shall otherwise require, any reference to any Contract Document, other document or legal requirement is to it as amended and supplemented from time to time (and, in the case of any Law or otherwise controlling or applicable authority enacted or adopted by a Governmental Authority having jurisdiction, including all Environmental Laws, to any successor provision thereof). Any reference in this Contract to a "day" or a number of "days" (without the explicit qualification of "business") shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a business day, then such action or notice shall be deferred until, or may be taken or given on, the next business day. Unless otherwise specifically indicated, the word "or" shall be deemed to be inclusive and not exclusive.

29

SECTION 30

<u>Counterparts</u>

<u>Counterparts</u>.  This Contract and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single agreement of the Contract.  Any signature delivered by facsimile or other electronic transmission, shall be deemed to be an original signature.

IN WITNESS WHEREOF, this Contract is hereby executed as of the date first above set forth.

**[SIGNATURE PAGE FOLLOWS]**

This Contract has been executed as of the Effective Date.

CONTRACTOR:

ANDRES CONSTRUCTION SERVICES, LLC
a Texas limited liability company


By:   Warren L. Andres,
      Senior Vice President


OWNER:

WINSTAR VILLAGE, LLC
an Oklahoma limited liability company


By:   Pat Neeley,
      Manager

31

35

Bond #46BCSGJ7564

# Construction Performance Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

| CONTRACTOR (Name and Address): | SURETY (Name and Principal Place of Business): |
|---|---|
| Andres Construction Services, LLC, a Texas limited liability company | Hartford Casualty Insurance Company |
| 3710 Rawlins, Suite 1510, Dallas, TX 75219 | Bond T-4, One Hartford Plaza, Hartford, CT 06155 |

OWNER (Name and Address):

Winstar Village, LLC, an Oklahoma limited liability company

2020 Lonnie Abbott Boulevard, Ada, OK 74820-9255

CONSTRUCTION CONTRACT
Date: 10/22/2012
Amount: Nineteen Million Seven Hundred Fifty Thousand Forty Six Dollars ($19,750,046.00)
Description (Name and Location):

"Central Park at Winstar Village", a 252-unit apartment complex in Love County, Oklahoma

BOND
Date (Not earlier than Construction Contract Date):10/22/2012
Amount: Nineteen Million Seven Hundred Fifty Thousand Forty Six Dollars ($19,750,046.00)
Modifications to this Bond Form:

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corp. Seal) | Company: | (Corp. Seal) |
| Andres Construction Services, LLC, a Texas limited liability company | | Hartford Casualty Insurance Company | |
| Signature: *Warren Andres* | | Signature: *Ginger Hoke* | |
| Name and Title:Warren L. Andres, Sr. VP. | | Name and Title: Ginger Hoke, Attorney-In-Fact | |

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corp. Seal) | Company: | (Corp. Seal) |
| | | | |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |

EJCDC No. 1910-28A (1984 Edition)
Prepared through the joint efforts of the Surety Association of America, Engineers' Joint Contract Documents Committee, the Associated General
Contractors of America, and the American Institute of Architects.


Exhibit 3

Bond #46BCSGJ7564

1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is no Owner Default the Surety's obligation under this Bond shall arise after:

3.1. The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below, that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2. The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3. The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3. Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4. Waive its right to perform and complete, arrange for completion or obtain a new contractor and with reasonable promptness under the circumstances:

1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

2. Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

6.1. The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2. Additional legal, design professional, and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3. Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors.

8. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts purchase orders and other obligations.

9. Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

10. Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the Construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12. DEFINITIONS.

12.1. Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

12.2. Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

12.3. Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

12.4. Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

---

*(FOR INFORMATION ONLY — Name, Address and Telephone)*
AGENT or BROKER:

OWNER'S REPRESENTATIVE (Architect, Engineer or other party):

# Construction Payment Bond

Bond #46BCSGJ7564

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

| CONTRACTOR (Name and Address): | SURETY (Name and Principal Place of Business) |
|---|---|
| Andres Construction Services, LLC, a Texas limited liability company | Hartford Casualty Insurance Company |
| 3710 Rawlins, Suite 1510, Dallas, TX 75219 | Bond T-4, One Hartford Plaza<br>Hartford, CT 06155 |

**OWNER (Name and Address):**

Winstar Village, LLC, an Oklahoma limited liability company

2020 Lonnie Abbott Boulevard, Ada, OK 74820-9255

**CONSTRUCTION CONTRACT**

Date: 10/22/2012

Amount: Nineteen Million Seven Hundred Fifty Thousand Forty Six Dollars ($19,750,046.00)

Description (Name and Location):

"Central Park at Winstar Village", a 252-unit apartment complex in Love County, Oklahoma

**BOND**

Date (Not earlier than Construction Contract Date): 10/22/2012

Amount: Nineteen Million Seven Hundred Fifty Thousand Forty Six Dollars ($19,750,046.00)

Modifications to this Bond Form:

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company:                      (Corp. Seal) | Company:                      (Corp. Seal) |
| Andres Construction Services, LLC, a Texas limited liability company | Hartford Casualty Insurance Company |
| Signature: _Warren Andres_ | Signature: _Ginger Hoke_ |
| Name and Title: Warren L. Andres Sr. VP. | Name and Title: Ginger Hoke, Attorney-In-Fact |

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company:                      · (Corp. Seal) | Company:                      (Corp. Seal) |
| Signature: | . Signature: |
| Name and Title: | Name and Title: |

EJCDC No. 1910-28B (1984 Edition)
Prepared through the joint efforts of the Surety Association of America, Engineers' Joint Contract Documents Committee, the Associated General Contractors of America, American Institute of Architects, American Subcontractors Association, and the Associated Specialty Contractors.

1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

With respect to the Owner, this obligation shall be null and void if the Contractor:

2.1 Promptly makes payment, directly or indirectly, for all sums due Claimants, and

2.2 Defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety and provided there is no Owner Default.

3. With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due:

4. The Surety shall have no obligation to Claimants under this bond until:

4.1 Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and with substantial accuracy, the amount of the claim.

4.2 Claimants who do not have a direct contract with the Contractor:

1. Have furnished written notice tot he Contractor and sent a copy, or notice thereof, to the owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

2. Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

3. Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in Paragraph 12) and sent a copy or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

5. If a notice required by Paragraph 4 is given by the Owner to the contractor or to the Surety, that is sufficient compliance.

6. When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

6.1 Send an answer to the claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and that basis for challenging any amounts that are disputed.

6.2 Pay or arrange for payment of any undisputed amounts.

7. The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8. Amounts owned by the Owner to the contractor under the construction Contract shall be used for the performance of the Construction Contract

and to satisfy claims, if any, under any Construction Performance bond. By the Contractor furnishing and the Owner accepting this bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this bond, subject to the Owner's priority to use the funds for the completion of the work.

9. The surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract The Owner shall not be liable for payment of any costs or expenses of any Claimant under this Bond, and shall have under this bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

10. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11. No suit or action shall be commenced by a Claimant under this bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located of after the expiration of one year from the date (1) on which the claimant gave the notice required by Subparagraph 4.1 or Clause 4.2 (iii) or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the construction Contract, whichever of (1) or (2) first occcurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12. Notice to the Surety, the Owner or the contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in the Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is, that this bond shall be construed as a statutory bond and not as a common law bond.

14. Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15. DEFINITIONS:

15.1 Claimant: An individual or entity having a direct contract with the Contractor or with a subcontractor of the contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this bond shall be to include without limitation in the terms "labor, materials or equipment:" that part of water, gas, power, light, heat oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.



**Dual Obligee Rider**  THE HARTFORD        **Bond No.:**  46BCSGJ7564

WHEREAS, on or about the          22          day of    October , 20 12

### Andres Construction Services, LLC, a Texas limited liability company
, as Contractor, entered into a written agreement with

### Winstar Village, LLC, an Oklahoma limited liability company
, as Owner, for the construction of

### "Central Park at Winstar Village", a 252-unit apartment complex in Love County, Oklahoma
herein referred to as the Contract, and
### Andres Construction Services, LLC, a Texas limited liability company

WHEREAS, the Contractor, as Principal, and   Hartford Casualty Insurance Company
, as
Surety, made, executed and delivered to said Owner, as Obligee, their joint and several
Bond, and

### Winstar Village, LLC, an Oklahoma limited liability company
WHEREAS, the Owner, as Obligee, has requested that

### Kirkpatrick Bank, an Oklahoma banking corporation
, having a material interest in the performance of said contract, be added as an Obligee in said Bond and has requested the Principal and the Surety to join with the Owner, as Obligee, in the execution and delivery of this Rider and the Principal and Surety have agreed so to do upon the conditions herein stated.

NOW, THEREFORE, in consideration of the premium charged for said Bond and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby agree as follows:

1. That, **Kirkpatrick Bank, an Oklahoma banking corporation**
is hereby added to said Bond as a named Obligee.

2. That, the rights of the Obligees are and shall be subject to the condition precedent that all the Owner's obligations to the Principal under said contract be performed by or on behalf of the Owner; provided, however, that the aggregate liability of the Surety under said Bond to the Obligees, as their interests may appear, is limited tot he penal sum of the Bond and provided, further, that the Surety may, at its option, make any payments under said Bond jointly to the Obligees; and further provided there shall be no liability under the Bond to the Obligees, jointly or severally, unless payment be made to the Principal at the time and in the manner provided in the contract.

3. Except as herein modified, said Bond shall be and remain in full force and effect.

SIGNED, SEALED AND DATED this          22          day of    October          , 2012

**Winstar Village, LLC, an Oklahoma limited liability** **Andres Construction Services, LLC, a Texas company**
**limited liability company**
Owner                                             Contractor

By: PAT NEELEY, MANAGER                    By: Warren L. Andres, Sr. VP.

                                                  Hartford Casualty Insurance Company
                                                  Surety

                                                  By: Ginger Hoke, Attorney-In-Fact

Form S-3950-1  Printed in U.S.A.

# POWER OF ATTORNEY

*Direct Inquiries/Claims to:*
**THE HARTFORD**
BOND, T-4
One Hartford Plaza
Hartford, Connecticut 06155
*call:* 888-266-3488 *or fax:* 860-757-5835
Agency Code: 46-501647

**KNOW ALL PERSONS BY THESE PRESENTS THAT:**

| | |
|---|---|
| X | **Hartford Fire Insurance Company,** a corporation duly organized under the laws of the State of Connecticut |
| X | **Hartford Casualty Insurance Company,** a corporation duly organized under the laws of the State of Indiana |
| X | **Hartford Accident and Indemnity Company,** a corporation duly organized under the laws of the State of Connecticut |
| | **Hartford Underwriters Insurance Company,** a corporation duly organized under the laws of the State of Connecticut |
| | **Twin City Fire Insurance Company,** a corporation duly organized under the laws of the State of Indiana |
| | **Hartford Insurance Company of Illinois,** a corporation duly organized under the laws of the State of Illinois |
| | **Hartford Insurance Company of the Midwest,** a corporation duly organized under the laws of the State of Indiana |
| | **Hartford Insurance Company of the Southeast,** a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut, (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint, *up to the amount of unlimited:*

*William D. Birdsong, Ginger Hoke*
of
*Dallas, TX*

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as delineated above by ☒, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

**In Witness Whereof,** and as authorized by a Resolution of the Board of Directors of the Companies on January 22, 2004 the Companies have caused these presents to be signed by its Assistant Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.



Wesley W. Cowling, Assistant Secretary                    M. Ross Fisher, Assistant Vice President

**STATE OF CONNECTICUT**
} ss.   Hartford
**COUNTY OF HARTFORD**

On this 3rd day of November, 2008, before me personally came M. Ross Fisher, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hartford, State of Connecticut; that he is the Assistant Vice President of the Companies, the corporations described in and which executed the above instrument; that he knows the seals of the said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his name thereto by like authority.

Scott E. Paseka
Notary Public
My Commission Expires October 31, 2012

**CERTIFICATE**

I, the undersigned, Assistant Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of *22 October 2012*.
Signed and sealed at the City of Hartford.

       

Gary W. Stumper, Assistant Vice President

# EXHIBIT B

280201400051500006

## COMMERCIAL GENERAL LIABILITY DECLARATIONS
### OCCURRENCE

**Liberty Mutual.**
INSURANCE

Issued By Liberty Mutual Fire Insurance Co.

| | |
|---|---|
| Policy Number  TB2-691-462998-024 | Issuing Office  IRVING, TX |
| New | Issue Date  2014-09-30 |
| Account Number  9-462998 | Sub Account  0000 |

Named Insured and Mailing Address
Andres Construction Services, LLC
3710 Rawlins St Ste 1510
Dallas TX 75219-4273

Form of Business: Limited Liability Company

Policy Period: The policy period is from 09/01/2014 to 09/01/2015 12:01 A.M. standard time at the Insured's mailing address.

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| Each Occurrence Limit | $ 1,000,000 | |
| Damage to Premises Rented to You Limit | $ 500,000 | Any one premises |
| Medical Expense Limit | $ 10,000 | Any one person |
| Personal & Advertising Injury Limit | $ 1,000,000 | |
| General Aggregate Limit | $ 2,000,000 | |
| Products-Completed Operations Aggregate Limit | $ 2,000,000 | |

### SCHEDULE

The declarations are completed on the accompanying "Declarations Extension Schedule(s)".

| | | |
|---|---|---|
| Commercial General Liability Coverage Part Premium | $ | 32,968 |
| Endorsement Premium | $ | 5,000 |
| Total Estimated Premium | $ | 37,968 |
| Other Charge(s) | $ | |

Policywriting Minimum Premium  $  1,000

Forms Applicable: See Attached Inventory

ARTHUR J 0002208635
ARTHUR J GALLAGHER RISK MANAGEMENT
SERVI
TWO LINCOLN CENTRE
5420 LBJ FWY STE 400
DALLAS TX 75240
Producer  MASTERS      R 8828
IRVING, TX

LC 00 04 08 12          © 2012 Liberty Mutual Insurance. All rights reserved.          **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc. with
its permission.

25320150000320005

**COMMERCIAL GENERAL LIABILITY DECLARATIONS**
**OCCURRENCE**



Issued By Liberty Mutual Fire Insurance Co.

| | | |
|---|---|---|
| Policy Number  TB2-691-462998-025 | Issuing Office  IRVING, TX | |
| Renewal Of     TB2-691-462998-024 | Issue Date     2015-09-02 | |
| Account Number  9-462998 | Sub Account    0000 | |

Named Insured and Mailing Address                                   Franchise    9215
Andres Construction Services, LLC
3710 Rawlins St Ste 1510
Dallas TX 75219-4273


Form of Business:  Limited Liability Company

Policy Period: The policy period is from 09/01/2015  to 09/01/2016  12:01 A.M. standard time at the Insured's mailing address.

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| Each Occurrence Limit | $ 1,000,000 | |
| Damage to Premises Rented to You Limit | $ 500,000 | Any one premises |
| Medical Expense Limit | $ 10,000 | Any one person |
| Personal & Advertising Injury Limit | $ 1,000,000 | |
| General Aggregate Limit | $ 2,000,000 | |
| Products-Completed Operations Aggregate Limit | $ 2,000,000 | |

## SCHEDULE

The declarations are completed on the accompanying "Declarations Extension Schedule(s)".

| | | |
|---|---|---|
| Commercial General Liability Coverage Part Premium | $ | 34,616 |
| Endorsement Premium | $ | 8,898 |
| Total Estimated Premium | $ | 43,514 |
| Other Charge(s) | $ | |

Policywriting Minimum Premium   $  1,000

Forms Applicable:  See Attached Inventory


ARTHUR J 0002208635
ARTHUR J GALLAGHER RISK MANAGEMENT
SERVI
5420 LYNDON B JOHNSON FWY
STE 400
DALLAS TX 752406222
Producer  MASTERS      R 8828
IRVING, TX


LC 00 04 08 12            © 2012 Liberty Mutual Insurance. All rights reserved.            Page 1 of 1
                  Includes copyrighted material of Insurance Services Office, Inc. with
                                        its permission.

279201600027200007

COMMERCIAL GENERAL LIABILITY DECLARATIONS
OCCURRENCE



Issued By Liberty Mutual Fire Insurance Co.

| | |
|---|---|
| Policy Number  TB2-691-462998-026 | Issuing Office  IRVING, TX |
| Renewal Of     TB2-691-462998-025 | Issue Date     2016-09-23 |
| Account Number  9-462998 | Sub Account  0000 |

Named Insured and Mailing Address
Andres Construction Services, LLC
3710 Rawlins St Ste 1510
Dallas TX 75219-4273

Franchise    9215

Form of Business: Limited Liability Company

Policy Period: The policy period is from 09/01/2016 to 09/01/2017 12:01 A.M. standard time at the Insured's mailing address.

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| Each Occurrence Limit | $ 1,000,000 | |
| Damage to Premises Rented to You Limit | $ 500,000 | Any one premises |
| Medical Expense Limit | $ 10,000 | Any one person |
| Personal & Advertising Injury Limit | $ 1,000,000 | |
| General Aggregate Limit | $ 2,000,000 | |
| Products-Completed Operations Aggregate Limit | $ 2,000,000 | |

## SCHEDULE

The declarations are completed on the accompanying "Declarations Extension Schedule(s)".

| | | |
|---|---|---|
| Commercial General Liability Coverage Part Premium | $ | 36,556 |
| Endorsement Premium | $ | 5,898 |
| Total Estimated Premium | $ | 42,454 |
| Other Charge(s) | $ | |

Policywriting Minimum Premium   $  1,000

Forms Applicable: See Attached Inventory

ARTHUR J 0002208635
ARTHUR J GALLAGHER RISK MANAGEMENT
SERVI
5420 LYNDON B JOHNSON FWY
STE 400
DALLAS TX 752406222
Producer  MASTERS     R 8828
IRVING, TX

LC 00 04 08 12    © 2012 Liberty Mutual Insurance. All rights reserved.    Page 1 of 1
Includes copyrighted material of Insurance Services Office, Inc. with
its permission.

# EXHIBIT C

**Policy Number**
**41PKG8883000**

### COMMON POLICY DECLARATIONS

## ARCH INSURANCE COMPANY

Named Insured    ANDRES CONSTRUCTION SERVICES,          Effective Date:  09-01-12
                                                        12:01 A.M., Standard Time

Agent Name    ARTHUR J. GALLAGHER & CO. OF TEXAS, INC.    Agent No.    10094

| **Item 1.**    Named Insured and Mailing Address | Agent Name and Address |
|---|---|
| ANDRES CONSTRUCTION SERVICES, LLC<br>(SEE BROAD FORM NAMED INSURED ENDT)<br>3710 RAWLINS STREET<br>SUITE 1510<br>DALLAS TX 75219 | ARTHUR J. GALLAGHER & CO. OF TEXAS,<br>INC.<br>14241 DALLAS PARKWAY<br>SUITE 300<br>DALLAS TX 75254<br>Agent No. 10094 |

| **Item 2.**    Policy Period         From:  09-01-2012      To:  09-01-2013 |
|---|
| **at 12:01 A.M., Standard Time at your mailing address shown above.** |

**Item 3.**    Business Description:
Form of Business:     LIMITED LIABILITY COMPANY

**Item 4.**    In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts for which a premium is indicated.  Where no premium is shown, there is no coverage.  This premium may be subject to adjustment.

| Coverage Part(s) | Premium | |
|---|---|---|
| Commercial Property Coverage Part | | NOT COVERED |
| Commercial General Liability Coverage Part | $ | 190,494.00 |
| Commercial Crime Coverage Part | | NOT COVERED |
| Commercial Inland Marine Coverage Part | | NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | $ | 5,704.00 |
| Commercial Garage Coverage Part | | NOT COVERED |
| | | |
| | | |
| TAX OR SURCHARGE | $ | 8.00 |
| | | |
| **Total Policy Premium** | $ | 196,206.00 |

**Item 5.**    Forms and Endorsements

Forms(s) and Endorsement(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

Countersigned:

Date:  10-31-12                        By: _____

                                           Authorized Representative

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

**FAIC-SKLBUS-CPD (6/01)**

**Policy Number**
**41PKG8909501**

### COMMON POLICY DECLARATIONS

## ARCH INSURANCE COMPANY

Named Insured      ANDRES CONSTRUCTION SERVICES,               Effective Date:  09-01-13
                                                              12:01 A.M., Standard Time

Agent Name     ARTHUR J. GALLAGHER & CO. OF TEXAS, INC.       Agent No.    10094

| Item 1. | Named Insured and Mailing Address | Agent Name and Address |
|---|---|---|
| ANDRES CONSTRUCTION SERVICES, LLC (SEE BROAD FORM NAMED INSURED ENDT) 3710 RAWLINS STREET SUITE 1510 DALLAS TX 75219 | | ARTHUR J. GALLAGHER & CO. OF TEXAS, INC. 14241 DALLAS PARKWAY SUITE 300 DALLAS TX 75254 Agent No. 10094 |

| Item 2. | Policy Period | From:  09-01-2013 | To:  09-01-2014 |
|---|---|---|---|
| | **at 12:01 A.M., Standard Time at your mailing address shown above.** | | |

| Item 3. | Business Description: |
|---|---|
| | Form of Business:      LIMITED LIABILITY COMPANY |

| Item 4. | In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. |
|---|---|

This policy consists of the following coverage parts for which a premium is indicated.  Where no premium is shown, there is no coverage.  This premium may be subject to adjustment.

| Coverage Part(s) | | Premium |
|---|---|---|
| Commercial Property Coverage Part | | NOT COVERED |
| Commercial General Liability Coverage Part | $ | 126,264.00 |
| Commercial Crime Coverage Part | | NOT COVERED |
| Commercial Inland Marine Coverage Part | | NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | $ | 4,548.00 |
| Commercial Garage Coverage Part | | NOT COVERED |
| | | |
| | | |
| TAX OR SURCHARGE | $ | 6.00 |
| | | |
| **Total Policy Premium** | $ | 130,818.00 |

| Item 5. | Forms and Endorsements |
|---|---|

Forms(s) and Endorsements(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

Countersigned:

Date:  10-01-13                              By:  _____
                                                     Authorized Representative

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

**FAIC-SKLBUS-CPD (6/01)**

# EXHIBIT D



## ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.

199 Water Street, 24th Floor, New York, NY 10038 • Tel. (646) 794-0500 • Fax (646) 794-0611

---

## CONTRACTORS POLLUTION LIABILITY POLICY
## DECLARATIONS

Policy No:  0305-8920          New/Renewal of:  0305-8920

**ITEM 1.**  **NAMED INSURED**:  Andres Construction Services LLC
**ADDRESS**:  3710 Rawlins, Suite 1510
Dallas, TX 75219

**ITEM 2.**  **POLICY PERIOD**:  From:  September 1, 2014     To: September 1, 2015

[12:01 A.M. standard time at the address stated in Item 1 above]

**ITEM 3.**  **LIMITS OF INSURANCE**:

A.  US$15,000,000     Each Occurrence Limit
B.  US$15,000,000     Policy Limit

**ITEM 4.**  **DEDUCTIBLE**:

US$50,000     Each Occurrence Limit

**ITEM 5.**  **POLICY PREMIUM**:     US$22,874

**ITEM 6.**  **NOTICE OF POLLUTION**     ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.
**INCIDENT, CLAIM OR SUIT:**     ATTN:  ENVIRONMENTAL CLAIMS DEPT.
199 WATER STREET, 24TH FLOOR
NEW YORK, NY  10038
EnvCasClaims@awac.com

**ALL OTHER NOTICES:**     ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.
ATTN:  ENVIRONMENTAL CASUALTY
199 WATER STREET, 24TH FLOOR
NEW YORK, NY 10038

**ITEM 7.**  **REPRESENTATIVE OF THE**     Arthur J. Gallagher Risk Management Services, Inc.
**INSURED:**     Two Lincoln Centre, 5420 LBJ Parkway, Suite 400
**ADDRESS:**     Dallas, TX 75240